# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| CONSULNET COMPUTING, INC., d/b/a SUCCESS WEBSITE, | CIVIL ACTION |
| Plaintiff | No. 04-3485 |
| v. | |
| MEGEL DAVID MOORE, et al., | |
| Defendants | |
| v. | |
| STEVE RAITT, et al., | |
| Counter-Defendants. | |

Pollak, J.                                                    September 12, 2007

## OPINION

This case concerns two companies in the business of creating websites for real estate agents.  In brief, plaintiff ConsulNet Computing, Inc., d/b/a Success Website ("ConsulNet"), alleges that defendant Megel David Moore posed as a real estate agent and signed a contract for a ConsulNet website; that Moore copied the ConsulNet website; and that Moore and his company, defendant Dynamic Investment Group, Inc. ("DIG"), d/b/a Web Agent Solutions, used the copy to start DIG's competing business.  These actions, ConsulNet contends, amounted to breach of Moore's contract with ConsulNet;

intentional interference with ConsulNet's contractual relationships with its clients; and violations of U.S. and Canadian copyright law.

DIG has brought a counterclaim comprising two claims under the Lanham Act.[1] The first claim is based on alleged false advertising by ConsulNet and the second on an alleged false statement to a DIG client by a ConsulNet employee.  DIG has brought these claims against ConsulNet as well as counter-defendants Steve Raitt, Doug Brajer, and Murrray Campbell, each of whom is associated with ConsulNet.

Before the court are the following three motions: a partial motion for summary judgment filed by the defendants, Docket No. 92; a second partial motion for summary judgment filed by the defendants, Docket No. 93; and a motion for summary judgment on DIG's counterclaim filed ConsulNet, Docket No. 90.  For the reasons set forth below, the court will deny DIG's two partial motions for summary judgment and grant ConsulNet's motion for summary judgment.

## I. Background

ConsulNet is a Canadian company based in Toronto that has been in the business of Internet-based marketing for real estate agents (or "realtors"[2]) since approximately

---

[1] Moore was not named as a party in the counterclaim or amended counterclaim. *See* Counterclaim ¶ 179 (Docket No. 18); Amended Counterclaim ¶ 179 (Docket No. 56).

[2] According to the American Heritage dictionary and other sources, "realtor" is a term of art reserved for real estate agents who are affiliated with the National Association of Realtors.  Nevertheless, for brevity's sake, the court refers to real estate agents as realtors.

1998.  CN exh. B at 185 (Raitt deposition).[3]  Specifically, ConsulNet creates and maintains websites for realtors to hold out as their own.  The websites may be quite similar to one another, but are at least partially individualized for each realtor — for instance, by making reference to the realtor's geographic location.  *See* CN exh. J. Generally speaking, the websites encourage visitors to submit their contact information to the realtor on a web-based form in exchange for information attractive to potential buyers and sellers — *e.g.*, tips on how to sell a house.  After the website visitor clicks on a link for one of the articles on the website's main page, a form appears in which the visitor must fill his or her contact information before he or she can gain access to the article. The realtor can then use the contact information collected by the website to attempt to gain the website visitor as a client.  The so-called "back end" of the website, not visible to visitors of the website, keeps track of the website's visitors for the realtor.

The websites created by ConsulNet for realtors make use of marketing strategies developed by Craig Proctor, a Canadian realtor who since the early 1990s has been giving seminars to other realtors on how to be successful in the business.  *See* CN exh. A (Proctor deposition).  Pursuant to an agreement between ConsulNet and Craig Proctor Productions, Inc. ("Proctor"), ConsulNet creates and leases websites that enable realtors

---

[3] "CN" refers to ConsulNet's "omnibus" brief in response to DIG's two partial motions for summary judgment.  "DIG I" refers to the defendants' partial motion for summary judgment on counts one, two, and seven; "DIG II" to their motion on counts five and six; and "DIG Reply" to their reply.  "CN Mot." refers to ConsulNet's motion for summary judgment on DIG's counterclaim; "DIG Resp." to DIG's response to that motion; and "CN Reply" to ConsulNet's reply.

to employ Proctor's marketing strategies on the Internet, and, in doing so, to make use of written materials (or "content") created by Proctor — for instance, the aforementioned tips on how to sell a house. *See* CN exh. C.

ConsulNet's complaint alleges, and DIG has not disputed, that ConsulNet has "thousands" of clients. *See* ConsulNet Complaint ¶ 22 (Docket No. 1); CN exh. H at 9 & exh. G-1 (damages expert report indicating that ConsulNet had 4,162 clients in its "database" as of December 31, 2006).

In the late 1990s, defendant Moore founded DIG and had various Internet businesses, including a website that provided information to stock market traders, www.theprotrader.com. *See* CN exh. E at 19-22, 44-45; CN exh. F at ¶ 5. Moore's involvement in real estate websites began after one of his employees, Frank Cundari, created a website for Scott Irvin, who was just entering the real estate business. (Irvin was formerly a defendant in this case but has been dismissed. *See* Docket No. 34.)

Irvin states in a sworn affidavit that he attended a conference put on by Craig Proctor in November 2001. *See* CN Exh. F ¶ 7. Irvin asked Cundari to create a website because he considered too expensive the ConsulNet websites promoted by Proctor. *Id.* ¶ 8. Irvin paid $60 to Cundari for the website. *Id.* ¶ 10. Irvin states that he provided Cundari with www.craigproctor.com "[a]s an example of the type of site [he] was looking for." *Id.* The website created by Cundari for Irvin was located at www.theprotrader.com/si. *Id.*

In approximately November 2002, Moore and Irvin agreed that Moore would take over the project of creating Irvin's website.  *Id*. ¶¶ 13-15; CN exh. E at 172.  Irvin states that he gave Proctor's seminar materials to Moore and that in February 2003 Irvin signed a $5,200 contract with Moore to create Irvin's website.  CN exh. F ¶¶ 15-16.

Moore admits that in January 2003 he signed up for a ConsulNet website in his own name and states that he informed a ConsulNet employee that he was signing up on behalf of Irvin.  CN exh. E at 173-75, 180-85, 189-91.  Moore has not disputed the alleged terms of his contract with ConsulNet, which included (1) that ConsulNet granted Moore only "a limited, . . . non-transferable license to use the [website] for your personal use for the purposes of advertising and marketing your own products and services in connection with your personal real estate agency practice," and (2) that, upon termination of Moore's ConsulNet subscription, he would "not be entitled to use the proprietary Content for any reason or in any way whatsoever," "including, but not limited to, publishing on any website."  CN exh. D ¶ 4 (ConsulNet's terms as of Oct. 16, 2002); *see* ConsulNet Complaint ¶¶ 83-84 (alleging same).

At the time that Moore developed Irvin's website, www.scottirvin.com, Moore had had little or no experience in the real estate business and had not had a business developing websites for realtors.  *See* CN exh. E at 14-17; CN exh. F ¶¶ 17, 19.  After developing Irvin's website, or in conjunction with doing so, Moore and his company DIG entered the business of creating such websites.  *See id*. at 207-10; *id.* at 259 (first

customers signed up in July 2003).  It is undisputed that a number of ConsulNet clients

thereafter left ConsulNet for DIG or acquired DIG websites in addition to their ConsulNet

websites.  *See id*. at 259-60 (Moore stating that 80% of his first 40 or 50 clients were

former ConsulNet clients); DIG I exh. H at 97-100 (deposition of former ConsulNet

customer discussing switch to DIG); CN exh. H (ConsulNet's damage expert's lost profit

estimates, based on appended client lists).

## II. Procedural History

ConsulNet filed its complaint in July 2004.  In October 2004, the defendants filed

an answer and DIG's counterclaim.  In February 2006 the defendants filed DIG's

amended counterclaim.[4]  In January 2007, the parties stipulated to dismissal of six of

ConsulNet's eleven claims.[5]  The parties also stipulated to paring down ConsulNet's two

copyright infringement counts by eliminating the allegations regarding Exhibits B, C, F,

and G of the complaint.

ConsulNet's remaining claims are for breach of contract under Pennsylvania law

_____

[4] In the briefing, DIG and Moore imply that Moore is also a counterclaimant.  *See* Docket No. 106 ("Responsive Brief of Defendants in Opposition to the Summary Judgment Motion of ConsulNet to Dismiss the Amended Counterclaim of Defendants"). However, because DIG is the only plaintiff in the amended counterclaim, *see* Amended Counterclaim ¶ 179, the court refers to the counterclaim as DIG's.

[5] These were count three (unfair competition under the Lanham Act); count four (unfair competition under the Canadian Competition Act); count eight (misappropriation of trade secrets); count nine (commercial disparagement); count ten (unfair competition under the Canadian Trade-Marks Act); and count eleven (injurious falsehood).  Docket No. 86, at 1 (Jan. 12, 2007).

(count one); intentional breach of contract and duty of good faith under Canadian law

(count two); copyright infringement under U.S. law (count five – although only with

regard to exhibits A, D, and E of the complaint); copyright infringement under Canadian

law (count six – again only with regard to exhibits A, D, and E); and intentional

interference with contractual relationships under Pennsylvania law (count seven).

In March 2007, this court denied ConsulNet's April 2006 motion to dismiss counts

three through five of the defendants' amended counterclaim, essentially on the ground

that the motion was moot.  *See* Docket Nos. 79, 97.  The parties had already stipulated to

the dismissal of counts two, three, and five,[6] and the motion was moot as to count four of

the counterclaim because ConsulNet had already filed the instant motion for summary

judgment.  Thus, only the Lanham Act claims in counts one and four remain.

### III. Standard at Summary Judgment

Summary judgment should be granted where "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue of material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c); *see IFC Interconsult, AG v. Safeguard Int'l*

*Partners, L.L.C.*, 438 F.3d 298, 317 (3d Cir. 2006).  A genuine issue of material fact

exists where the jury could reasonably find for the non-moving party.  *Anderson v.*

---

[6]Those counts claimed unfair competition under the Canadian Competition Act
(count two), copyright infringement (count three), and tortious interference with
contractual relations (count five).

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over facts is material where it could affect the outcome of the case.  *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003).

A party seeking the grant of summary judgment carries the initial burden of informing the district court of the basis for its motion and identifying the portions of the record that show that there is no genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986); *Belitskus*, 343 F.3d at 639.  Where the non-moving party bears the burden of proof — as is the case for all of the claims presently before this court — the moving party must show that the non-moving party cannot support its case with the evidence in the record.  *Celotex*, 477 U.S. at 325.  In rebuttal, the non-moving party must then identify facts that create a genuine issue of dispute for trial.  Fed. R. Civ. P. 56(e); *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## IV. Discussion

### A. DIG's Motion on ConsulNet's Contract Claims

Defendants Moore and DIG offer a single argument in their partial motion for summary judgment on ConsulNet's claims for breach of contract (count one), intentional

-8-

breach of contract and the duty of good faith under Canadian law (count two), and

intentional interference with contractual relations (count seven).  The defendants contend

that they are entitled to summary judgment on these claims because, for each of the

claims, ConsulNet has failed to raise a genuine issue of material fact regarding resultant

damages.

That the plaintiff suffered damages as a result of the defendant's conduct is, of

course, an element of each of ConsulNet's three claims.  *See Williams v. Nationwide Mut.*

*Ins. Co.*, 750 A.2d 881, 884 (Pa. Super. Ct. 2000) (breach of contract); *Pawlowski v.*

*Smorto*, 588 A.2d 36, 40 (Pa. Super. Ct. 1991) (tortious interference with contractual

relations); *Dentech Prods. Inc. v. Demed Mfg. Ltd.*, [2003] 35 B.C.L.R.3d 301 (affirming

dismissal of breach of contract claim because plaintiff failed to show that defendant

caused plaintiff damages).  Although courts have articulated distinct legal standards for

causation with regard to each of ConsulNet's three causes of action, the defendants'

motion draws no such distinctions, and ruling on the motion does not require limning

them.

Nor does ruling on the defendants' motion require a complete exegesis of the

disputed facts.  In short, ConsulNet alleges that Moore breached his January 2003

contract with ConsulNet in two ways: first, by using ConsulNet's proprietary information

for purposes other than those specified in Moore's contract with ConsulNet, and second,

by disclosing that proprietary information after cancelling his ConsulNet membership.

*Cf.* DIG I exh. C, D (Moore's contract for his ConsulNet website).  In the count pertaining to the claim of intentional breach of contract and breach of the duty of good faith under Canadian law, the complaint alleges that Moore entered into the agreement with ConsulNet with malice and bad faith and without the intention to abide by the agreement.  ConsulNet's claim for intentional interference with contractual relations is based on allegations that Moore and DIG knowingly induced ConsulNet's clients not to perform or renew their contracts with ConsulNet.

The defendants move for summary judgment on these claims on the ground that ConsulNet has failed to demonstrate a genuine issue of material fact concerning whether the defendants' alleged conduct caused ConsulNet actual damages.  *See* DIG I at 24 ("Even assuming . . . that (a) Moore entered into and breached the Consulnet contract, and (b) Consulnet has entered into contracts with its clients, that DIG knew of those contracts, that DIG intentionally contacted certain clients of Consulnet, and c) that certain of the Consulnet clients thereafter cancelled their contracts with Consulnet, . . . . [t]here is <u>no</u> evidence, indeed, there is <u>no</u> testimony, that Consulnet can point to showing that any alleged clients who cancelled their Consulnet contracts did so 'as a result of' any contact or action by DIG." (emphases in original)).  In support of their motion, the defendants cite the affidavits of five former ConsulNet clients and the deposition testimony of two such former clients, each of whom states that he or she ceased doing business with ConsulNet due to dissatisfaction with ConsulNet's product or service.  *See* DIG I at 17-23 & exh. F-

J.[7]  The defendants contend that the deposition testimony and affidavits show that it was not DIG's conduct that caused the flight of ConsulNet clients to DIG, but rather ConsulNet's own shortcomings.  *See* DIG I at 16.

In response, ConsulNet points to circumstantial evidence tending to show that the defendants' actions did cause ConsulNet damages in the form of lost profits.  *See* CN at 17-23.  This evidence includes, but is not limited to: (1) various pieces of evidence tending to show the similarities between the websites, including comparisons contained in DIG's promotional materials; (2) an affidavit from a ConsulNet client named Adam Robinson stating that in May 2003 he was contacted by a DIG representative who told him that she was contacting ConsulNet clients to offer them "a competing website product that included all of the ConsulNet website features, plus some additional ones, for less money" and that many ConsulNet clients were making the switch, *see* CN exh. L; (3) a contemporaneous e-mail from Robinson to a ConsulNet employee describing this phone call and forwarding correspondence from the DIG representative that apparently compares DIG's websites to ConsulNet's, *see id*. exh. 1; (4) Moore's admission that approximately 80% of his clients in his first year in business were former ConsulNet

---

[7] ConsulNet moves to strike these five affidavits because the defendants filed them four months after the close of discovery without seeking leave of the court to do so.  *See* CN at 12-16; Fed. R. Civ. P. 37(c)(1).  ConsulNet also moves to strike the affidavit of Rick Brash (exhibit F) on the ground that it is "full of hearsay and improper opinion." CN at 14.  Because the affidavits are, at this stage, harmless, the court will deny these motions to strike as moot, without prejudice to renewing them at a later date.  *See Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*, 350 F. Supp. 2d 613, 620 (E.D. Pa. 2004).

clients, *see* CN exh. E at 259-60; and (5) the report of ConsulNet's damages expert detailing alleged lost profits caused by the flight of 175 ConsulNet clients to DIG, *see* CN exh. H at 6.

ConsulNet's evidence is more than sufficient to create a genuine issue for trial. That is, assuming that a fact-finder believed that the defendants engaged in the alleged wrongful conduct, there is sufficient evidence from which the fact-finder could draw a "legitimate inference[]" that the defendants' conduct did cause ConsulNet damages in the form of lost profits due to clients who left ConsulNet for DIG. *Anderson*, 477 U.S. at 255. ConsulNet has produced evidence that DIG contacted people known to DIG to be ConsulNet clients concerning DIG's competing product, and that clients left ConsulNet for DIG. This evidence suffices to create a genuine issue of material fact regarding whether the defendants' alleged wrongful conduct resulted in damages to ConsulNet. The court will therefore deny the defendants' partial motion for summary judgment on counts one, two, and seven.

## B. DIG's Motion on ConsulNet's Copyright Claims

The defendants' second partial motion for summary judgment contends that ConsulNet's copyright claims must fail because the allegedly infringed material is a system, concept, or idea and therefore not protected under U.S. and Canadian copyright law. DIG II at 8-14.

"To establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the

plaintiff's work." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002). "Copying refers to the act of infringing any of the exclusive rights that accrue to the owner of a valid copyright, as set forth at 17 U.S.C. § 106, 'including the rights to distribute and reproduce copyrighted material.'" *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 207 (3d Cir. 2005) (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991)). "It may be demonstrated by showing that the defendant had access to the copyrighted work and that the original and allegedly infringing works share substantial similarities." *Id.* at 207-08.

Determining whether the works share "substantial similarities" entails two considerations. First, the fact-finder must determine "whether there is sufficient similarity between the works so as to conclude that the alleged infringer 'copied' the work." *Dam Things from Denmark v. Russ Berrie & Co.*, 290 F.3d 548, 562 (3d Cir. 2002). At this stage, expert testimony regarding actual copying may aid the fact-finder. *Id.* "Second, the fact-finder is to determine whether a 'lay-observer' would believe that the copying was of protectible aspects of the copyrighted work." *Id.* Thus, although direct evidence of copying is relevant, it is not sufficient: "The trial court . . . must still consider whether the copying is actionable, viewing the item through the lay person's eyes, focusing on whether the substantial similarities relate to protectible material." *Id.* In deciding whether copying was of "protectible aspects" of the work, "a fact-finder must determine whether the later work is similar because it appropriates the unique expressions

of the original author, or merely because it contains elements that would be expected when two works express the same idea or explore the same theme." *Kay Berry*, 421 F.3d at 208.

"Because '[n]o easy rule of thumb can be stated as to the quantum of fragmented literal similarity permitted without crossing the line of substantial similarity,' whether works are substantially similar is 'a classic jury question.'" *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 943 (10th Cir. 2002) (quoting 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[A][2], at 13-46 and n.96 (2001)).

"It is a fundamental premise of copyright law that an author can protect only the expression of an idea, but not the idea itself." *Kay Berry*, 421 F.3d at 208.  The U.S. Copyright Act does not extend copyright protection to "any idea, procedure, process, system, method of operation, concept, principle, or discovery."  17 U.S.C. § 102(b). Likewise, under Canadian law, "[i]t is . . .  an elementary principle of copyright law that an author has no copyright in ideas but only in his expression of them." *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339 ¶ 8 (quoting *Moreau v. St. Vincent*, [1950] 3 D.L.R. 713 ¶ 8).

Defendants contend that they are entitled to summary judgment on ConsulNet's copyright claims because ConsulNet is seeking copyright protection for a system or concept rather than expression.  DIG II at 2.  In support of their motion, the defendants point to numerous places in the record where experts and lay witnesses discuss the

-14-

common concept behind the ConsulNet and DIG websites.  *See* DIG II at 9-14 (collecting numerous uses of the words "system" and "concept").

ConsulNet responds that the record contains other evidence tending to show that DIG infringed protected aspects of ConsulNet's websites — specifically, by copying or only slightly altering written content from ConsulNet webpages and presenting that content in DIG websites with a substantially similar "look and feel."[8]  CN at 25-26.  In addition to expert and lay assessments of the similarities between the ConsulNet and DIG websites' appearances, *see* CN exh. B at 197 (Raitt deposition); CN exh. S at 24-25 (Campbell deposition); exh. T at 3, 18-19 (Deale expert report), this evidence includes an alleged DIG webpage presenting written content that bears obvious similarities to the alleged ConsulNet webpage contained in exhibit E of ConsulNet's complaint.  *Compare* CN exh. P (DIG webpage headed "Don't sign another lease until you have read this special report!") *with* CN exh. Q (ConsulNet webpage headed "Don't Pay Another Cent in Rent to Your Landlord Before You Read This FREE Special Report") *and* ConsulNet Complaint exh. E.

The defendants cannot prevail on their motion.  ConsulNet's copyright claims are not based on alleged infringement of ConsulNet's marketing system or concept, per se.

---

[8] Courts sometimes describe the substantial similarity test as an inquiry into whether the works share an "overall look and feel" or "total concept and feel."  *See Stromback v. New Line Cinema*, 384 F.3d 283, 297 (6th Cir. 2004); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002); *Boyds Collection, Ltd. v. Bearington Collection, Inc.*, 360 F. Supp. 2d 655, 664 (M.D. Pa. 2005).

*See* CN at 23-27.  Rather, each of the two copyright counts alleges that (1) "[t]he *language* of the [defendants'] websites is substantially similar to and/or derived from [ConsulNet's]" and (2) "[t]he look and feel of [the defendants'] websites is substantially similar to websites [ConsulNet] has designed for its customers."  ConsulNet Complaint ¶¶ 117-18, 130-31 (emphasis added).  With the evidence briefly described above, ConsulNet has created a genuine issue of material fact concerning these "protectible aspects" of its works — that is, the content that appears on ConsulNet websites, as opposed to the marketing ploy behind the website.  The court therefore will deny the defendants' partial motion for summary judgment on ConsulNet's two copyright claims.[9]

### C. ConsulNet's Motion for Summary Judgment on the Counterclaim

---

[9] ConsulNet also relies on direct evidence of copying in the form of code underlying DIG webpages that, according to ConsulNet's expert Michael Deale, is obviously copied from a ConsulNet webpage.  *See* CN at 26.  Deale states that the copying is obvious because the code relates to a function that exists on many of ConsulNet's websites, but does not exist on DIG's.  That is, the code appears to be a vestige of prior copying that was never erased by DIG.  *See* CN exh. V at 8 (supplementary report of expert Deale).  DIG contends that Deale's supplementary report should be stricken because it was not submitted until January 9, 2007, months after the expert reports were due on August 11, 2006.  DIG Reply at 5-6.  (The supplementary report is styled as a further response to questions posed by DIG's counsel to Deale at his November 28, 2006 deposition.  *See* CN exh. V at 2.)  DIG also contends that DIG is not responsible for any copying of code that occurred, and that any such copying is de minimus.  DIG Reply at 6-9.  Ironically, DIG attaches new affidavits supporting its contentions.  *See* DIG Reply exh. 1, 4, 5, 6.  In turn, ConsulNet objects to these affidavits in a letter to the court.  The court finds it unnecessary to delve into the subject of the alleged direct copying of code for purposes of ruling on the instant motion; ConsulNet's evidence suffices to defeat summary judgment even without evidence of direct copying.  The court will therefore deny the parties' respective motions to strike as moot, without prejudice.

ConsulNet moves for an order granting summary judgment in its favor on DIG's counterclaim.[10]  The counterclaim comprises two claims under § 43(a) of the Lanham Act.  The first claim is based on alleged false advertising by ConsulNet and the second on an alleged false statement to a DIG client by counterclaim defendant Steve Raitt.

### 1. False Advertising

Section 43(a) of the Lanham Act provides in pertinent part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  In an action under this section, a plaintiff's complaint usually must allege: "'1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate

_____

[10] Three counts from DIG's five-count amended counterclaim of February 15, 2006, are no longer before the court.  DIG voluntarily dismissed the copyright infringement claim.  *See* Docket No. 79 (May 10, 2006).  After ConsulNet filed the instant motion for summary judgment and memorandum in support in January 2007, the parties jointly stipulated to the dismissal of the claims of unfair competition under Canadian law and tortious interference with contractual relations under U.S. law.  Docket No. 97 (Feb. 28, 2007).  ConsulNet's motion for summary judgment on these counts will therefore be denied as moot.

commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.'" *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 872 (3d Cir. 1992) (quoting *U.S. Healthcare v. Blue Cross of Gr. Philadelphia*, 898 F.2d 914, 922-23 (3d Cir. 1990)) (alteration in *Ditri*).

However, a plaintiff's burden differs depending on whether the plaintiff alleges that the advertisement is "(1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002).  A claim for misleading advertising requires a plaintiff to show "that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience" and "that the deception is material in that it is likely to influence purchasing decisions." *Id*. at 590. However, "[i]f a plaintiff proves that the challenged commercial claims are 'literally false,' a court may grant relief without considering whether the buying public was actually misled." *Id*. at 586.

"In analyzing whether an advertisement or product name is literally false, a court must determine, first, the unambiguous claims made by the advertisement or product name, and second, whether those claims are false." *Id*.  "A 'literally false' message may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'" *Id*. at 586-87 (quoting *Clorox Co. v. Proctor & Gamble*

-18-

*Commercial Co.*, 228 F.3d 24, 35 (1st Cir. 2000)). "Regardless, only an unambiguous message can be literally false." *Id*. at 587.

DIG is apparently proceeding under the theory that ConsulNet's advertisements are literally false.[11]  Three alleged false statements by ConsulNet form the basis of DIG's claim: (1) that ConsulNet's websites obtain a 10.5% response rate, *i.e.*, that 10.5% of visitors submit identifying information to the website; (2) that ConsulNet's websites, once established, are "worry-free" and "automatic"; and (3) that ConsulNet websites make it "possible to triple your real estate sales while working no more that a standard 40-hour week." *See* DIG Resp. at 6, 16-20.

### a. Response Rate

The amended counterclaim alleges that ConsulNet's statement that certain ConsulNet websites achieve a response rate of 10.5% is false, and that "Consulnet's branded sites, on average, have response percentages are [sic] far below 10.5%." Amended Counterclaim ¶¶ 235-36.

The 10.5% claim appears in a four-page ConsulNet advertisement attached to the

---

[11]  Accordingly, the court does not address ConsulNet's argument concerning DIG's putative misleading advertising claim. *See* CN Mot. at 28-30.  DIG's response to ConsulNet's motion (a) states, or at least strongly implies, that DIG is relying solely on the Lanham Act's "false" prong and (b) does not respond to ConsulNet's contention that DIG's misleading advertising claim must fail for lack of evidence on actual deception or the tendency to deceive.  *See* DIG Resp. at 15-16 (noting, in section titled "DIG's False Advertising Count," that where advertisement is shown to be literally false, no evidence is required that consumers were misled); *id*. at 16-20 (addressing the alleged falsity and misleading quality of ConsulNet's advertising, but not pointing to evidence of its tendency to deceive or of actual deception).

defendants' response as exhibit D.  The advertisement's first page contains a table listing

nine ConsulNet websites, four of them marked as "branded" and five of them as

"unbranded."[12]  The table is introduced by the sentence: "Here is what I found amongst

our top performing sites in a recent month."  The table lists a response rate for each of the

nine websites.  The bottom three rows of the table list average response rates for the

branded websites (10.5%), the unbranded websites (30.5%), and the "Industry Average"

(0.5% to 2%).  Toward the end of two columns of text on page two, the advertisement

states: "Most realtor sites average a response percentage of between 0.5% and 2%, if

they're lucky.  A response rate of 5% is usually considered to be outstanding.  The

average response percentage of our *SuccessWebsites* is roughly 10.5%."

ConsulNet's motion for summary judgment contends that this 10.5% figure quite

obviously relates to the "top performing sites" referred to by ConsulNet in the table on

page one and that DIG is "attempt[ing] to create confusion where none exists."  CN Mot.

at 28.  In support, ConsulNet cites deposition testimony from counterclaim defendant

Murray Campbell that the 10.5% figure seemed to Murray an accurate approximation of

the top-performing sites' average response rate.  *Id*. (citing CN Mot. exh. J at 54-55, 75-

76).

---

[12] "Branded" websites are those that, to visitors, are obviously websites belonging
to and promoting particular realtors.  "Unbranded" websites are those that appear to be
simply informational websites for potential buyers and sellers.  *See* DIG Resp. exh. D at 2
("The only difference [between the two kinds of websites] is that on the unbranded site
we've removed anything that made it look like a typical real estate agent site.").

DIG does not deny that the 10.5% figure appears to relate to the table on page one. Indeed, DIG contends that ConsulNet's 10.5% claim "is literally false because the 10.5% rate appears to selectively [sic] calculated by using *only 3 or 4* of the top Consulnet clients' branded websites." DIG Resp. 7 (emphasis in original). In support of its argument that the average response rate for all branded ConsulNet websites is not 10.5%, DIG cites a single piece of evidence: the affidavit of Jay Kinder, a current DIG client and former ConsulNet client. *See* DIG Resp. exh. E ¶ 6.[13] Kinder avers that, in her experience, "my branded websites have never achieved a response rate near 10%." *Id*. ¶ 10. "Moreover," she adds, "I have never heard of any Consulnet member achieving a response rate for a branded website approaching 10%." *Id*.

ConsulNet's 10.5% claim on page two of the advertisement cannot support DIG's claim for false advertising. As both ConsulNet and DIG note, *see* CN Reply at 6; DIG Resp. 7, the objected-to reference to 10.5% on the second page apparently refers back to the table of top-performing sites. The court must examine the 10.5% "in full context," which includes the table on page one. *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993). Taken in context, the 10.5% statement on page two cannot qualify as an

---

[13] ConsulNet objects to the court's considering the Kinder affidavit on the ground that DIG failed to disclose Kinder in accordance with Fed. R. Civ. P. 26(a) or 26(e)(1). *See* ConsulNet Reply at 2-3; Fed. R. Civ. P. 37(c)(1) ("A party that without substantial justification fails to disclose information . . . . is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any witness or information not so disclosed."). The court finds DIG's failure to disclose harmless at this stage and denies ConsulNet's motion to preclude without prejudice to renewing it at a later date.

"unambiguous claim" that the average ConsulNet website — as opposed to a "top performing" website — achieves 10.5%. *Cf. Novartis Consumer Health*, 290 F.3d at 586-87 (stating that "a court must determine, first, the unambiguous claims made by the advertisement" because "only an unambiguous message can be literally false"). The court therefore finds that the alleged false statement is not actionable as false advertising under the Lanham Act.

**b. "Worry-Free" and "Automatic" Website**

The second alleged false statement by ConsulNet, as stated by DIG in its response memorandum, is:

> You don't need to know anything about computers or the Internet!  We take care of everything . . . site maintenance . . . . Once it's online, you don't need to worry about the site.  You simply follow-up on the HOT prospects that are automatically generated for you.

DIG Resp. 18 (altering by omissions a ConsulNet advertisement appearing at DIG Resp. exh. B at 11-12).[14]  ConsulNet contends that this portion of the advertisement, as altered by DIG, cannot be the basis for a false advertising claim, because the quoted portion is mere puffery.  CN Reply 8-9.

"Puffery" is not actionable under the Lanham Act.  *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993).  "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language," "distinguishable from misdescriptions or

_____

[14]  DIG's ellipses serve to omit, *inter alia*, the advertisement's claim that new ConsulNet clients' websites will be "up and running on the Internet, in one week."  DIG Resp. exh. B at 12.

false representations of specific characteristics of a product." *Id*. "The 'puffing' rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific." *Id*. (quoting W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 109, at 756-57 (5th ed. 1984)). That is, puffery consists of "hyperbolic statements one would [not] take or be intended to take literally." *Toro Co. v. Textron, Inc*., 499 F. Supp. 241, 253 n.23 (D. Del. 1980). Claims that are "specific and measurable" are not puffery. *Castrol*, 987 F.2d at 946.

In support of its contention that the statement constitutes false advertising, DIG cites affidavits from former ConsulNet clients, attesting to worrying about their ConsulNet websites. *See* DIG Resp. exh. F ¶ 9 (Kinder affidavit); *id*. exh. E ¶ 9 (Wall affidavit[15]); *id*. at 19 (referring also to the affidavits concerning ConsulNet's poor customer service appended to DIG's partial motion for summary judgment on the contract claims).[16] ConsulNet contends that its statement is non-actionable puffery. CN Reply 8-9.

The promise that ConsulNet's websites will alleviate "worry" by generating leads is not an objectively measurable claim about ConsulNet's product. Rather, the promise is

---

[15] The copy of the Wall affidavit contained in the exhibits attached to DIG's memorandum is not signed or notarized. DIG has petitioned the court to substitute a signed and notarized copy. Docket No. 107 (Mar. 13, 2003). ConsulNet has not opposed this motion. The court will grant it.

[16] As noted above, *supra* n.13, ConsulNet objects to the court's considering the late-disclosed Kinder affidavit; however, the court finds the affidavit harmless.

"broad, vague, and commendatory." *Castrol*, 987 F.2d at 945.  *Castrol*, 987 F.2d at 945.

The court finds that ConsulNet's alleged false statement is indeed mere puffery and

therefore not actionable under the Lanham Act.  *See id*.  *Cf. Leykin v. AT & T Corp*., 423

F. Supp. 2d 229, 247 (S.D.N.Y. 2006) (statement that company would "not have to worry

in the near term about financing" was "mere generalized expression[] of puffery and

optimism" not actionable under security laws); *Catalano v. N.W.A., Inc.*, No. PI 98-7768,

1998 WL 777023, at *9 (D. Minn. Sept. 15, 1998) ("worry-free" language in vacation

brochure was "mere puffery and not a guarantee" sufficient to support claim for fraud or

misrepresentation).

### c. Tripling Real Estate Sales

The amended counterclaim alleges that ConsulNet's statement that "[o]ur members

have learned that it really is possible to triple your real estate sales while working no more

than a standard 40-hour week" is false because, "[u]pon information and belief . . . few if

any of Consulnet's clients have ever experienced a tripling affect [sic] in their business as

a direct result of using a Consulnet website."  Amended Counterclaim ¶¶ 217-18.  In

response to ConsulNet's motion for summary judgment contending that DIG has not

produced any competent evidence of the falsity of the tripling statement, *see* CN Mot. 26,

DIG cites only two pieces of evidence: the Kinder and Wall affidavits produced for the

first time along with DIG's response to ConsulNet's motion.  Each affidavit states, "My

direct experience after using a Consulnet website, indeed any website, is that I did not and

could not triple my business while still working a 40-hour week."  DIG Resp. exh. E ¶ 8

(Kinder affidavit); *id*. exh. F (Wall affidavit).

The Kinder and Wall affidavits, standing alone, are insufficient to create a genuine

issue for trial.  DIG has not come forth with evidence of the results generally achieved by

ConsulNet's thousands of clients.  Such evidence is necessary to show whether it is

indeed not "possible" to triple one's sales while working a 40-hour week.  No reasonable

fact-finder could find the advertisement false — *i.e.*, that it is impossible for a ConsulNet

client to triple sales while working a 40-hour week, or that no ConsulNet client has — on

the basis of the evidence before the court: that two of these thousands of ConsulNet

clients state without further elaboration that they themselves were unable to achieve such

results.  *Cf. Anderson*, 477 U.S. at 248 (*"*[S]ummary judgment will not lie if . . . the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

### d. Conclusion

In sum, the court will grant ConsulNet's motion with regard to DIG's false

advertising claim (count one of the counterclaim) because neither the "10.5%" statement

nor the "worry-free" statement is actionable under the Lanham Act, and because DIG has

not created a genuine issue of material fact regarding the falsity of the "tripling sales"

statement.

### 2. False Statement

ConsulNet contends that it is entitled to summary judgment on DIG's second claim

under § 43 of the Lanham Act because DIG's allegations fail to state a cognizable claim

under either 15 U.S.C. § 1125(a)(1)(A) or (B).[17] *See* CN Mot. 33-35; CN Reply 10-13.

Broadly speaking, "§ 43(a) prohibits attempts to pass one's goods or services off as those of a competitor and attempts to misrepresent the nature and quality of goods or services brought to the market." *BIEC Intern., Inc. v. Global Steel Services, Ltd.*, 791 F. Supp. 489, 533 (E.D. Pa 1992). "Examples of such uncompetitive practices include: the unauthorized use of a competitor's trademark, the unprivileged imitation of a competitor's trademark, service mark, logo, or trade dress, and the publication of false or misleading advertisements." *Id.*; *see also Green v. Fornario*, 486 F.3d 100, 103 (3d Cir. 2007) (stating that "§ 1125 creates civil liability for misdescribing goods in commerce, importing mislabeled goods, diluting the value of a famous mark, and cybersquatting"). *Cf.* 15 U.S.C. § 1125(a)(1)(A) (creating cause of action against one who "uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person"); *id.* § 1125(a)(1)(B) (cause of action for false

---

[17] DIG's counterclaim was initially also based on an additional allegation that ConsulNet hacked into DIG's website. *See* DIG Amended Counterclaim ¶ 295. It appears from DIG's response brief, which contains no defense of this alleged basis for the Lanham Act claim, that DIG has abandoned it. *Cf.* CN Mot. 35-36 (addressing hacking allegation).

advertising discussed above).

Where a plaintiff brings an action under § 1125(a)(1)(B) claiming that the defendant made disparaging remarks that harmed the plaintiff's business, those remarks must qualify as "commercial advertising or promotion," in accordance with that section's language. *See id*. § 1125(a)(1)(B) ("[a]ny person who . . . in commercial advertising or promotion, misrepresents . . . "). The "touchstone of whether a defendant's actions" so qualify is whether "the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). Thus, "[p]roof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement," and "isolated disparaging statements do not have redress under the Lanham Act." *Id*.

DIG's second Lanham Act claim is based counterclaim defendant Steve Raitt's alleged statement to Richard Wall, a former ConsulNet client who had switched to DIG, that Wall was about to be "'dumped' by DIG." Amended Counterclaim ¶ 249 (alleging that Raitt made such a statement to multiple clients); CN Mot. exh. L at 75 (Moore clarifying in deposition testimony that he had identified only Wall as a person to whom Raitt made the statement). Wall testified in his deposition that Raitt said to Wall at a ConsulNet seminar: "You know what, you better come back before you're dumped." DIG Resp. exh. H at 102. Wall interpreted this comment as "insinuating that [Raitt] was going to put [DIG] out of business." *Id*. at 103.

After canvassing cases describing the scope of the Lanham Act, ConsulNet's motion asserts that "[n]othing in the case law suggests that a single stray remark, such as the one allegedly made by Steve Raitt, could give rise to a Lanham Act claim for false designation or false advertising under Section 1125(a)."  CN Mot. at 35.

In response, DIG recites the elements of a claim for false or misleading advertising under § 1125(a)(1)(B) and asserts that Wall's deposition testimony is on its own sufficient evidence to support a claim under either § 1125(a)(1)(A) or § 1125(a)(1)(B).  DIG Resp. 20-21.

DIG makes no attempt to explain how Raitt's alleged statement is actionable under § 1125(a)(1)(A), which pertains to false designation of origin, nor is any such theory apparent.  Accordingly, the court finds that DIG has failed to state a claim under § 1125(a)(1)(A).

Nor has DIG presented evidence supporting a false advertising claim under § 1125(a)(1)(B).  Raitt's single comment to Wall is not sufficient to raise a genuine issue of material fact that the counter-defendants engaged in "commercial advertising or promotion" within the meaning of § 1125(a)(1)(B).  That is, the remark is, without more, insufficient as a matter of law to establish "an organized campaign to penetrate the relevant market" or "widespread dissemination within the relevant industry."  *Fashion Boutique*, 314 F.3d at 57; *see Allen Neurosurgical Assocs., Inc. v. Lehigh Valley Health Allen Neurosurgical Associates, Inc. v. Lehigh Valley Health Network*, No. 99-4653, 2001

-28-

WL 41143 (E.D. Pa. Jan. 18, 2001) (holding that dissemination of disparaging statement to two patients did not qualify as advertising or promotion).

Because DIG has not come forth with evidence sufficient to maintain a claim under § 1125(a)(1)(A) or (B), the court will grant ConsulNet's motion with regard to this second Lanham Act claim.

## Conclusion

For the reasons stated above, the court will deny the two partial motions for summary judgment filed by DIG and Moore; the court will grant ConsulNet's motion for summary judgment on the counterclaim; and the court will deny as moot, without prejudice, the parties' various motions to strike and preclude evidence.  An appropriate order follows.

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSULNET COMPUTING, INC., d/b/a
SUCCESS WEBSITE,

             Plaintiff

   v.

MEGEL DAVID MOORE, et al.,

             Defendants

   v.

STEVE RAITT, et al.,

             Counter-Defendants.

CIVIL ACTION

No. 04-3485

### Order

AND NOW, this 12th day of September, 2007, upon consideration of the two partial motions for summary judgment filed by defendants Dynamic Investment Group and Moore (Docket Nos. 92, 93), the brief in opposition thereto by plaintiff ConsulNet Computing (Docket No. 104), and the defendants' reply (Docket No. 112); and upon consideration of counterclaim defendant ConsulNet Computing's motion for summary judgment on the amended counterclaim (Docket No. 90), the brief in opposition thereto filed by counterclaimant Dynamic Investment Group (Docket No. 106), and ConsulNet's reply (Docket No. 109), as well as the subsequent filings in this case, **IT IS ORDERED**:

    1.    For the reasons stated in the accompanying memorandum, the two partial

           motions for summary judgment filed by defendants Dynamic Investment

-30-

Group and Moore (Docket Nos. 92, 93) are **DENIED**;

2.      Counterclaim defendant ConsulNet's motion for summary judgment

(Docket No. 90) is **GRANTED** in part and **DENIED** in part:

    a.      For the reasons stated in the accompanying memorandum,

        ConsulNet's motion is **GRANTED** on counts one and four of the

        amended counterclaim;

    b.      The parties having jointly stipulated to the dismissal of counts two

        and five of the amended counterclaim (Docket No. 97), Consulnet's

        motion is **DENIED** as **MOOT** on counts two and five;

3.      For the reasons stated in the accompanying memorandum, the unopposed

petition of counterclaimant Dynamic Investment Group to substitute a

signed, notarized copy of the Tracy Wall affidavit (Docket No. 107) is

**GRANTED**;

4.      For the reasons stated in the accompanying memorandum, the parties'

motions to strike or preclude the supplementary report of Michael Deale

and the affidavits of Jay Kinder, Rick Brash, Richard Machado, Jeff

Thompson, Warren Cleveland, and Steve Saunders are **DENIED** as **MOOT**

without prejudice to renewing them at a later date.

                        /s/ Louis H. Pollak

                        _____

                        Pollak, J.