**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CONSULNET COMPUTING, INC., d/b/a SUCCESS WEBSITE, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 04-CV-3485 |
| | : | |
| v. | : | |
| | : | |
| MEGEL DAVID MOORE, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF CONSULNET COMPUTING, INC.'S MEMORANDUM
OF LAW IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*
TO EXCLUDE PORTIONS OF THE TESTIMONY OF EXPERTS
JOHN B. HOKKANEN AND WAYNE A. HOEBERLEIN**

**I.    Introduction**

"[] Mr. Hokkanen appears to have extensive experience in real estate, and website development. . . ."[1]

*"There is no question that Mr. Hoeberlein is qualified to testify as a damages expert."*[2]

As these two statements demonstrate, defendants agree that ConsulNet's experts John Hokkanen and Wayne Hoeberlein have the necessary expertise to testify on liability and damages, respectively.  Indeed, defendants' Daubert motion is very narrow.  With respect to Hokkanen, defendants do not challenge Hokkanen's evaluation of real estate marketing; his assessment of Craig Proctor's niche in the market; Hokkanen's comparison of ConsulNet websites to others in the market; or his analysis of ConsulNet's and DIG's respective business

---

[1]    Brief of Defendants in Support of Their Motion *In Limine* to Preclude Certain Expert Reports and Expert Testimony of Plaintiff as Being Unreliable, Unsupported, and/or Irrelevant ("Defendants' Brief"), at 20.

[2]    Id. at 7.

methodologies.  Rather, defendants primarily attempt to exclude a narrow slice of John

Hokkanen's expert report relating to certain charts and graphs illustrating his analysis through a

quantitative presentation.

Hokkanen translated his qualitative website investigation, to which defendants do not

object on Daubert grounds, into quantitative terms using Microsoft Excel to perform standard

mathematical calculations like means, percentages, standard deviations and t-tests.  Defendants

view this exercise as impermissible, arguing that Hokkanen suffers from a "lack of expertise in

mathematics and/or statistics[,]" and further that his website analysis is too unreliable.  Id. at 4,

5.  This over-reaching attack on Hokkanen means that any individuals working in the social, as

opposed to the "hard" sciences, cannot employ simple, high school/freshman-level calculations

to illustrate their research findings.  This is not the intent of Federal Rule of Evidence 702 or the

Supreme Court's Daubert decision.  Not every psychologist, anthropologist, sociologist or, as in

this case, real estate website expert, must be a Ph.D. in statistics to use standard tools to calculate

percentages, means and create bell curves.  Nor must these specialists have written the

underlying computer code for the Microsoft Excel spreadsheets they utilize in their work.  Yet,

this is the level of "expertise" defendants contend is required by Daubert to submit to the jury the

small number of visual depictions found in Hokkanen's report.

As an afterthought, defendants argue that "Mr. Hokkanen's study and report . . . is wholly

irrelevant and of no use to the jury" because "Mr. Hokkanen did no more than what any member

of the juror [sic] could do," i.e., compare websites.  Id. at 7.  Given that Daubert's "helpfulness"

prong requires no more than an expert to offer specialized insight beyond the knowledge of a lay

juror, Hokkanen's expert report most certainly qualifies.  As discussed below, his work flows

from a hands-on, "business case analysis" performed as part of his real estate practice,[3] and addresses the very issue at the heart of this case, that is, the extent to which Craig Proctor and ConsulNet introduced unique materials and related innovations into the online real estate industry and whether or not defendants stole them.  Expert guidance on this central issue no doubt would be helpful to the jury at trial.

With respect to ConsulNet's damages expert Wayne Hoeberlein, after conceding, as they must, that Hoeberlein is a seasoned, well-qualified damages expert, defendants complain that he assumed liability and causation to create his report.  See Defendants' Brief at 2, 8-9.  However, this is standard fare for damages experts.  Hoeberlein is not offered as a fact witness, nor has he ever purported to be one.  It is ConsulNet's burden to introduce sufficient circumstantial evidence of causation at trial, and it intends to do so.  Defendants' invocation of Daubert with regard to Hoeberlein's testimony is nothing more than a thinly-veiled attempt to reargue the damages and causation sections of their summary judgment motion.  That motion already was rejected, in full, by this Court.  See ConsulNet Computing, Inc. v. Moore et al., 2007 WL 2702446, at *5 (E.D. Pa. Sept. 12, 2007) (with respect to defendants' motion on the causation/damages issue, the Court held that "ConsulNet's evidence is more than sufficient to create a genuine issue for trial").  Moreover, Hoeberlein's assumption of causation was appropriate in this case given the evidence proffered by ConsulNet that the parties essentially compete in a two-vendor market for online real estate services.

For these reasons, ConsulNet requests that defendants' motion in limine to exclude portions of the Hokkanen and Hoeberlein expert reports be denied.

---

[3]      See Exhibit A attached hereto (excerpts from the transcript of the November 30, 2006 deposition of John B. Hokkanen), at 166-67.

II.     **Mr. Hokkanen Is Qualified to Offer the Jury the Expert Opinions Found in His Report, Those Opinions Are Reliable and the Product of a Replicable Methodology, and His Opinions on Online Real Estate Marketing Would Be Helpful to the Jury.**

A.     **Overview of John Hokkanen's Expert Report**

John Hokkanen submitted an expert report on various issues concerning the online real estate industry, direct-response marketing in that industry and the parties' competing real estate website products.  See generally Exhibit B attached hereto.  He has sufficient training and experience to offer opinions in each of these subject matter areas.  Hokkanen has a technological background in the real estate, professional services, credit union and defense industries.  See id., § 1.1.  He has developed and built actual websites and is, in fact, a practicing real estate agent today.  See Exhibit A at 93.  Hokkanen also taught adult education classes in real estate, worked as a Vice President for Technology for one "dot com" company and ran another website development company that serviced corporate clients.  Exhibit B, § 1.1.

Based on his specialized knowledge of the real estate industry and website development generally, Hokkanen opined that Craig Proctor designed and implemented a unique direct-response marketing program.  Id., §§ 2.0, 2.3.  This conclusion rests, in part, on a quadrant-style analysis that illustrates the interaction between real estate information, marketing efforts on the part of individual agents and the availability of information to potential buyers or sellers.  Id., § 2.0.

Hokkanen performed a qualitative review of various real estate websites' features.  Id., §§ 2.1-2.2.  He selected a sample of real estate websites from among those in the San Diego, California market, with which he has first-hand experience, and supplemented that list with websites from vendors identified during depositions taken in this litigation.  Id., § 2.1, Attachment A.  What he found, for example, was that "of all the vendors reviewed, only ConsulNet and DIG sites use restricted reports in the manner developed by the Craig Proctor

marketing system." Id., § 2.1.  Hokkanen then translated his findings into an empirical

presentation so that the results could be visualized.  Specifically, he used an Excel spreadsheet

and simple calculations like averages, percentages and t-tests to create a few "bell curves" to

illustrate the similarities between the parties' website products in comparison to other vendors in

the industry.  See id.

Hokkanen also analyzed the words, phrases and concepts the parties' implemented online

to determine whether defendants had copied the Proctor/ConsulNet proprietary system.  See id.,

§ 2.2.  This review led to his conclusion that "DIG uses the same words, concepts and style of

the Proctor/ConsulNet marketing campaigns."  Id., § 1.5.  Hokkanen also concluded that the

parties to this lawsuit each marketed restricted real estate reports via very similar unique selling

propositions ("USPs"), which other vendors failed to do.  Id.  Hokkanen further determined that

defendants copied the method ConsulNet deployed restricted template content ("CRT") and

restricted customized content ("CRC") on its websites.  Id.  Ultimately, based on these analyses,

his conclusion that the Proctor/ConsulNet real estate innovation "is not a trivial one," and his

understanding of David Moore's experience (or lack thereof) in real estate marketing, he opined

that "it [is] inconceivable that [Moore] designed and implemented the DIG system without

copying the system and approaches developed by Craig Proctor and ConsulNet."  Id., §§ 1.5, 2.3.

Defendants' motion *in limine* challenges Hokkanen's use of simple statistics to illustrate

the findings of his website case study, the sample size and methodology inherent to that study,

and, remarkably, the "helpfulness" of the entirety of his expert report.

**B.**     **Hokkanen's Diagrams Are Admissible under *Daubert*.**

Notably, defendants do not challenge Hokkanen's opinions on Craig Proctor's niche in

the Internet market at issue, or DIG's copying of the Proctor/Consulnet system.  Rather, DIG

focuses on Hokkanen's use of Microsoft Excel to create a few statistical calculations and bell

curves in his expert report.  See Defendants' Brief at 3-7, 16-22.  Under DIG's theory, a Ph.D. in statistics would be required before any expert could illustrate his work using Excel -- a common tool teenagers now learn to use in middle school.  As other Courts have found, challenges to the modest use of statistics to support a soft science analysis are more properly expressed as part of a cross-examination at trial.

For example, in West Tennessee Chapter of Associated Builders and Contractors, Inc. v. City of Memphis, 300 F. Supp. 2d 600 (W.D. Tenn. 2004), the trial court considered the defendant's motion in limine to limit the testimony offered by the plaintiff organization's expert, Dr. George LaNoue.  Dr. LaNoue's testimony critiqued a commissioned study of racial disparities in the city's public contracting process.[4]  Specifically, the expert was offered "as a political scientist with an expertise in public administration as applied to public contracting and [minority-owned business] programs[, and] as an expert in public policy analysis with an expertise in the development and evaluation of disparity studies."  Id. at 603 (citation omitted).  In its Daubert motion, the city argued that the expert "has not conducted a [disparity] study of his own, nor has he done any complex statistical analyses[]" in his past work, and therefore "lacks the necessary credentials and expertise to render opinions in the areas of statistics, econometrics and law. . . ."  Id.  The court ultimately rejected these claims and held that Dr. LaNoue's report survived Daubert scrutiny.

In doing so, the court first recognized that the proponents of experts "'do not have to demonstrate . . . that the assessments of their experts are correct, they only have to demonstrate . . . that their opinions are reliable . . . [t]he evidentiary requirement of reliability is lower than the

---

[4]     This study formed the basis for a program in Memphis to award a certain percentage of construction contracts to businesses owned by African-Americans and women.  Id. at 601.

merits standard of correctness.'"  Id. at 602 (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d

717, 744 (3d Cir. 1994)).  Upon review of the political scientist's background and his expert

report, the court found the statistical portion of the disparity study's critique to be

straightforward, rather than "too complex" for a social scientist:

> LaNoue's method is testable.  He has used simple methods to create his
> report.  "He did not personally conduct any statistical analyses in this case
> beyond simply counting numbers and calculating percentages." [. . .
> Moreover,] [s]ocial science and law do not subject studies to the same
> rigorous peer review of physics, chemistry and the hard sciences.

Id. at 604 (internal citations omitted).  And, while the expert's methods were considered

"contested" in the field, "[t]he legal standard for reliability is aimed at excluding outlying

evidence from experts without expertise near the arena of focus -- not eliminating one of many

viable options on a topic."  Id. at 605 (emphasis in original).  Finally, of note was the court's

refusal to exclude the expert's report because of his lack of specific experience in creating the

sort of disparity studies at issue.  The court considered this claim to "go to the weight that should

be given to LaNoue's testimony, rather than the admissibility of the testimony."  Id.

Defendants' present motion in limine is remarkably similar to that asserted by the City of

Memphis, and ultimately rejected, in West Tennessee.  In each case, an expert offered in the

"soft sciences" used some simple statistical calculations in his report, yet the opposing side

sought to paint the subject matter of the report as requiring an advanced degree in applied

mathematics, thus requiring the exclusion from trial of the expert's testimony.  Compare id. at

603 ("LaNoue lacks the necessary credentials and expertise to render opinions in the area[] of

statistics . . . he lacks experience in critical components of hypothesis testing and scientific

reasoning. . . .") with Defendants' Brief at 3-4 (Hokkanen's analysis "is based upon a baffling

(and wholly unprecedented) 'statistical analysis' . . . he has no experience or background in any

statistical or mathematical analyses").

Like the expert in West Tennessee, Hokkanen's calculations were simple, the methods were testable, and a math degree was not required for such examinations of uncomplicated "soft" science data. Hokkanen described his methodology and calculations at length in his expert report and in deposition testimony. With respect to his online real estate marketing quadrant, he explained to counsel for defendants exactly how he relied upon simple, well-known tools in the business/consulting world to devise this diagram. See Exhibit A at 115, 123-28, 144-49 (highlighting the Boston Consulting Group's "Growth-Share Matrix," Richard Susskind's THE FUTURE OF LAW, John P. Kotter's LEADING CHANGE, and Gartner, Inc.'s "Magic Quadrants" as bases for his quadrant-style analysis).[5]

Quadrant-style analyses are common in the business world. Attached as Exhibit C are various materials from the Boston Consulting Group ("BCG"), Professor Richard Susskind and Gartner, Inc., cited by Hokkanen. For example, BCG pioneered the "Growth-Share Matrix" to evaluate "the normal relationship of cash use and cash generation" for competing businesses, as well as growth rates and market shares. Id. Another example is "The Grid" conceived by Professor Susskind for examining the use of technologies across law firms, which tool "introduces and explains the relationships between various fundamental concepts, including knowledge management, information systems, information technology and e-commerce." Id. Gartner has deployed its analytic "Magic Quadrants" in literally hundreds of different ways. See www.gartner.com. These two-dimensional graphical frameworks place vendors in a given industry into a "strategic matrix" to examine their respective "completeness of vision" and

---

[5]     Importantly, Hokkanen observed during his deposition that "part of the thing is, is the literature on websites is a relatively new event. I mean, it's not -- people have been using grids for a long time. Websites have only been around ten years or so." Id. at 149.

"ability to execute."  See id.  Hokkanen's work is no more than an application of these well-established frameworks to the real estate website industry.

In addition, Hokkanen thoroughly addressed the "website feature" calculations contained in his report.  See Exhibit A at 172-77 (discussing the standard deviations of the data sets), 178-80 (calculating the website content percentages, then averaging the percentages) and 231-38 (the t-test performed).  Each of these are basic tools appearing in high schools and college textbooks.  Hokkanen, who helped develop the computer programs that run the nation's defense weapons systems, see Exhibit B, § 1.1, surely is capable of calculating averages, percentages and the like to produce a graph illustrating his analysis.

Reduced to its core, DIG's argument is that Hokkanen did not explain *how* the Excel spreadsheet he used during his website examination performed the actual t-test calculations.  See Defendants' Brief at 17-19.  Hokkanen simply (and honestly) testified that he relied upon the built-in computer program to run the calculations, see Exhibit A at 232-34, as millions of others do daily.  It is of little moment that he could not detail *how* the Microsoft computer program crunches the numbers, given the *de facto* reliability of the method, any more than it would disqualify an expert from testifying if he could not explain *how* his trusty Casio pocket calculator performed similar, standard calculations.  Of course, defendants cite no authority for their claim about Hokkanen's t-test and its purported Daubert implications.  The reason is simple:  none exists.

In their brief, defendants do cite State v. Spann, 130 N.J. 484 (1993), for the proposition that "where an expert uses statistics or mathematics to support his opinion on (for example) genetics, that expert must be qualified as an expert not only in genetics, but also in statistics or mathematics."  Defendants' Brief at 12.  Defendants' reliance on Spann to bolster their criticism

of Hokkanen's testimony is misplaced.  In <u>Spann</u>, the New Jersey Supreme Court affirmed the

lower court's ruling that expert opinion in a sexual assault/paternity case based on Bayes'

Theorem did not help the jury and, therefore, was inadmissible.  Specifically, the <u>Spann</u> Court

held that this theorem's "50-50" assumption of paternity "had no relation whatsoever to the facts

of the case" and "did not satisfy the most fundamental requirement of expert testimony:  its

ability to aid the jury in its deliberations."  <u>Id.</u> at 496, 498.  Citing <u>Spann</u> for the proposition that

any reference to mathematics in "soft sciences" requires a mathematics degree wholly ignores

the fact that <u>Spann</u> was a criminal case in which determining the paternity of the victim's child

required a statistical analysis of the defendant's blood and tissue as against *all other males*.

Thus, <u>Spann</u> was a *"hard science" case* involving almost, essentially, an *infinite sample*.

Notably, in a later decision the New Jersey Supreme Court specifically rejected the

notion that all experts offering testimony in any way related to statistical probabilities must be

qualified to, and ultimately, submit complicated statistical analyses as part of their work.  <u>See</u>

<u>State v. Noel</u>, 157 N.J. 141, 148 (1999) (reversing Appellate Division's order to exclude bullet

composition testimony) (observing that "the jury in the present case could evaluate the expert's

testimony without recourse to mathematical calculations").

Accordingly, defendants' <u>Daubert</u> motion should be denied.

### C.   <u>Hokkanen's Website Sample and Methodology Are Reliable.</u>

Defendants also challenge Hokkanen's methodology for selecting the website sample on

which part of his expert analysis is built.  To select this sample, Hokkanen assembled a list of

well-known vendors in San Diego, where he has first-hand knowledge of the real estate market,

and then supplemented this list with vendors specifically identified in the depositions taken

during this case.  <u>See</u> Exhibit B at Attachment A.  Hokkanen then used Google to identify

specific websites to scrutinize using simple Internet searches.  <u>See</u> <u>id.</u>  He then added an identical

number of websites from DIG and ConsulNet to use as the means for comparison.  See id.

Despite the "soft science" nature of Hokkanen's inquiry, and the admittedly limited scope of his

case study (i.e., to San Diego), defendants seek to exclude his analysis on Daubert "reliability"

grounds.  Here, too, caselaw undermines defendants' arguments.

In Ruiz v. Johnson, 37 F. Supp. 2d 855 (S.D. Tex. 1999), reversed in part on other

grounds, 178 F.3d 385 (5th Cir. 1999),[6] the trial court considered, inter alia, a motion by the

defendants, Texas penal officials, to exclude certain statistical evidence proffered by the plaintiff

inmates, which evidence was introduced to demonstrate systematic constitutional violations

resulting from the poor prison conditions rampant in the Texas penal system.  37 F. Supp. 2d at

888-89.  The defendants argued that the inmates' experts had not properly sampled existing

prison conditions, but rather "cherry-picked from the general prison population those cases

which appear to be the most egregious in order to show some type of violation[,]" and therefore

the experts' testimony was unreliable under Daubert.  See id. at 889-90.[7]  The trial court

overruled these objections and permitted the testimony.

---

[6]     The Fifth Circuit Court of Appeals reversed the district court's holding in Ruiz that a
provision of the Prison Litigation Reform Act of 1995 violated the separation of powers
requirement inherent to our constitutional framework.  Id.  The trial court's rulings on,
inter alia, evidentiary issues in the prison litigation survived the circuit court's opinion,
and such rulings later were reaffirmed by the trial judge on remand.  See Ruiz v. Johnson,
154 F. Supp. 2d 975, 984 (S.D. Tex. 2001).

[7]     The defendants particularly challenged the work of Dr. John Robertson, M.D., and Allen
Breed.  Id. at 889.  Dr. Robertson surveyed prisoners' quality of care by evaluating and
classifying the medical charts of 59 inmates who had died in 1998.  Id. at 894.  Early in
its opinion, the trial court observed that as of 1999 the Texas prison system incarcerated
approximately 140,000 inmates at over 100 penal institutions.  Id. at 860-61.  Allen Breed
opined upon inmate grievances and overall prison management, which work was based
on his past experience and visits to eighteen Texas prisons, representing about 32% of the
total prison population.  Id. at 919-20.

Significantly, the court first recognized that "an expert's evaluation of a prison system's quality of medical care, use of force, or protection of inmates *is not the type of testimony that necessarily implicates Daubert's requirement of scientific methodology*."  Id. at 890 (emphasis added).  In related fashion, "even if plaintiffs' experts' methodology is statistically invalid, *such a determination goes to the weight of the evidence, not its admissibility*."  Id. (emphasis added); see also West Tennessee, 300 F. Supp. 2d at 605.  Thus, the trial judge quickly put the proffered expert testimony on prison conditions in perspective, *i.e.*, it was not the stuff of "hard science" routinely subjected to the statistical scrutiny applied in other areas of scientific inquiry.

With further regard to the reliability of the experts' work, the court specifically observed:

> [S]tatistics has its limits when used in the courtroom. [. . .]  Nevertheless, the court agrees that statistics as a methodology can be useful.  Statistical procedures can increase the court's confidence in making inferences from a given set of data.  However, this is an issue of weight, rather than admissibility of a given methodology.  Statistical models are simply not the only method for making general inferences from specific data.

37 F. Supp. 2d at 891.  "The fact that 30 records show excessive uses of force does not change because the records were selected non-randomly."  Id.  Again, the court refused to subject the plaintiffs' experts' work to the level of Daubert scrutiny that normally would accompany statistical analyses in the "hard sciences."

As with the study in Ruiz, Hokkanen's study of Internet real estate marketing is not rendered inadmissible based on his selection of the sample.  Concerns over the size and selection process of Hokkanen's sample of real estate websites go to the weight to be given the evidence, to be determined by the fact-finder.  See West Tennessee, Ruiz, supra.  Because Federal Rule of Evidence 702 and Daubert are designed to shield the jury from the baseless opinions of unqualified or unprepared "experts," rather than to be wielded as swords to exclude from trial

evidence one side or another regards as damaging to its case, defendants' attacks on Hokkanen's

work should be rejected.

> **D.    DIG Admits that Hokkanen Has Specialized Knowledge in Real Estate and Website Development, and Therefore His Testimony Will Be Helpful to the Jury at Trial.**

Defendants weakly argue that Hokkanen's *entire expert report* would not be helpful to

the jury at trial.  See Defendants' Brief at 7, 22-23.  This claim can, and should, be summarily

rejected.  This contention runs directly counter to defendants' admission that "Hokkanen appears

to have extensive experience in real estate[] and website development[,]" Defendants' Brief at

20, two of the areas at the very heart of this case.

An expert's proposed testimony must be helpful to the finder of fact on issues relevant to

the resolution of the case before the Court.  See Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d

Cir. 2000) ("the trial judge must determine at the outset, pursuant to Rule 104(a), whether the

expert is proposing to testify to (1) scientific [or specialized] knowledge that (2) will assist the

trier of fact to understand or determine a fact in issue").  An expert should be admitted "if his

testimony will be helpful to the trier of fact in understanding evidence that is simply difficult,

[though] not beyond ordinary understanding."  United States v. Downing, 753 F.2d 1224, 1229

(3d Cir. 1985) (quotation omitted); see also In re Japanese Prod. Antitrust Litig., 723 F.2d 238,

279 (3d Cir. 1983), reversed on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574 (1986) ("even where jurors are well-equipped to make judgments on

the basis of their common knowledge and experience, experts may have specialized knowledge

to bring to bear on the same issue which would be helpful") (citation omitted).  Hokkanen's

expert report easily meets this relatively low standard.

Hokkanen possesses the requisite "specialized knowledge" on a variety of issues central

to this case, whether by training or experience.  Indeed, Hokkanen has designed and developed

real estate websites and taught adult education classes in the real estate field.  <u>See</u> Exhibit B, §

1.1.  He served as the Vice President of Technology for a company selling template-based

websites and ran another website development and hosting company designed to service

corporations.  <u>Id.</u>  He possesses specialized knowledge of more technical computer issues from

his days as a weapons systems programmer for large defense contractors.  <u>Id.</u>

      Using this specialized knowledge, Hokkanen's report provided the following analyses:

- necessary background information on the real estate industry (of which he possesses actual, first-hand knowledge, in contrast to defendants' experts);

- a macro-level "lay of the land" with regard to the techniques available to those marketing online real estate services;

- an analysis of Craig Proctor's niche in the marketplace;

- a business case-analysis survey of real estate websites in the San Diego, California market, and of the competitors identified by the parties;

- both qualitative and quantitative, graphical analyses of the results of this study;

- comparisons of the features of the DIG and ConsulNet websites; and

- conclusions about the methods used by the parties to employ direct-response marketing on the Internet.

<u>See</u> <u>generally</u> Exhibit B.  These simply are not issues on which lay jurors possess sufficient

knowledge or expertise; these issues require "specialized" knowledge.  <u>See</u> Fed. R. Evid. 702.

Even if a few jurors have *some* general knowledge about one or more of these matters,

Hokkanen's proposed testimony provides them with that "something extra" to more fully

understand the complexities of this case.  Therefore, Hokkanen's report meets <u>Daubert</u>'s

"helpfulness" requirement.  <u>See</u> <u>Downing</u>, <u>In re Japanese Prod. Antitrust Litig.</u>, <u>supra</u>.

Further, in Attachment A to his expert report, Hokkanen expressly laid out his methodology for the website comparison exercise that he conducted. See Exhibit B. Counsel for defendants is free to cross-examine Hokkanen on the details provided therein, including his calculations and the sample size of his survey. Claiming that there "is the potential for confusion on the part of the jury if presented with Mr. Hokkanen's analysis[,]" Defendants' Brief at 23, is a red herring. The same goes for defendants' argument that "Hokkanen's proposed testimony is not relevant and will not assist the jury in its factual determinations." Id. at 22.

First, under Rule 403 relevant evidence only should be excluded if "substantially outweighed by the [] confusion of the issues. . . ." Fed. R. Evid. 403. Of course, "[u]nfair prejudice means the *undue* tendency to suggest a decision based on improper considerations; it does not mean the damage to a defendant's case that results from [the] legitimate probative force of the [plaintiff's] evidence." Physician Care, P.C. v. Caremark, Inc., 16 F. Supp. 2d 806, 813 (E.D. Mich. 1998) (denying motion *in limine*) (citations omitted) (emphasis in original). Simply stringing together a few sentences that Hokkanen's analysis is "confusing" or "misleading" does not make it so. Again, defendants attempt to complicate an analysis that Hokkanen easily could, and will, explain to a lay jury. Thus, defendants have fallen woefully short of meeting Rule 403's standard for excluding evidence from trial.

Second, it is well-established that the standard for determining the relevancy of evidence under Rule 401 is "extremely liberal." Spain v. Gallegos, 26 F.3d 439, 452 (3d Cir. 1994); Douglass v. Eaton Corp., 956 F.2d 1339, 1344 (6th Cir. 1992). Such evidence need only "hav[e] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable. . . ." Fed. R. Evid. 401. On a variety of fronts, Hokkanen's report meets this standard with room to spare, as his opinions go right to the heart of

this case.  In sum, defendants may not simply ask the Court to preclude the entirety of

Hokkanen's anticipated testimony because, otherwise, they would be saddled with the "burden"

of crafting a cross-examination for trial.  Defendants' motion *in limine* seeking to exclude

Hokkanen's expert report therefore should be denied.

III.    **Defendants' Motion *in Limine* to Exclude Portions of Wayne Hoeberlein's Expert
        Report Merely Reargues Defendants' Failed Summary Judgment Motion, and
        <u>Therefore Fails to Articulate a Proper *Daubert* Basis to Exclude His Testimony.</u>**

        Wayne Hoeberlein submitted an expert report solely on the issue of damages, which the

jury may consider if ConsulNet sufficiently demonstrates at trial defendants' liability on the tort

and contract theories before the Court.  <u>See generally</u> Exhibit D attached hereto.  Hoeberlein

opined that ConsulNet has suffered damages in five distinct categories:  (1) the loss of

ConsulNet clients to DIG, through June 2006; (2) future losses (through lower seminar attendee

levels, fewer enrollees at more lucrative Coaching, Graduate and Platinum membership levels,

etc.); (3) lost revenue from "no-fee" websites provided to Platinum Level ConsulNet clients; (4)

increased licensing fees charged by Craig Proctor Productions, Inc.; and (5) DIG's revenue that

does not overlap with the damages stated above (unjust enrichment/disgorgement).  <u>See id.</u>

Interestingly, defendants do not scrutinize Hoeberlein's calculations or his specific methodology,

but rather his overall assumption of causation.

        Specifically, defendants seek to exclude the entirety of Hoeberlein's expert report on

<u>Daubert</u> grounds because, as they put it, "Mr. Hoeberlein conceded that his damages calculations

were based upon an assumption of liability, and assumed causation between the assumed liability

and the alleged damages."  Defendants' Brief at 23.  First, defendants contend that two elements

of ConsulNet's damages, *i.e.*, those relating to the ConsulNet/Craig Proctor Productions contract

renegotiation and ConsulNet's provision of "no fee" websites to some of its top real estate

agents, lack causation evidence in the record and, as a result, Hoeberlein may not assume

causation in his report.  Defendants' logic is flawed on multiple levels, each one fatal to their

motion *in limine*.

Questions of causation are generally for the jury, as fact-finder.  See, e.g., Rabutino v.

Freedom State Realty Co., Inc., 809 A.2d 933, 941 (Pa. Super. 2002); Reber v. Pennsylvania

Liquor Control Bd., 516 A.2d 440, 445 (Pa. Commw. 1986); E.J. Stewart, Inc. v. Aitken

Products, Inc., 607 F. Supp. 883, 886-89 (E.D. Pa. 1985).  Further, circumstantial evidence

suffices to put the issue of causation before the jury.  See Cade v. McDaniel, 679 A.2d 1266,

1271 (Pa. Super. 1996); Greenberg v. Croydon Plastics Co. Inc., 378 F. Supp. 806, 814 (E.D. Pa.

1974); Continental Data Systems, Inc. v. Exxon Corp., 638 F. Supp. 432, 443 (E.D. Pa. 1986).

This Court determined months ago that ConsulNet has proffered sufficient evidence of damages

on its tort and contract theories to reach trial.  See ConsulNet Computing, Inc. v. Moore et al.,

2007 WL 2702446, at *5 (E.D. Pa. Sept. 12, 2007).  The Court made this decision after

reviewing ConsulNet's laundry list of circumstantial evidence of causation, found in its summary

judgment response.[8]  Because causation is a factual issue for the jury, ConsulNet will proffer fact

witnesses to establish the requisite connections between its damages and defendants' wrongful

actions.  Hoeberlein is offered by ConsulNet to provide a calculation of damages should the jury

find liability.  He is not preferred as a liability witness, expert or fact.[9]

---

[8]     See ConsulNet's Omnibus Responsive Brief in Opposition to Defendants' Motions for
        Summary Judgment (March 2, 2007), at 20-22 (setting forth at least 14 separate pieces of
        causation-related evidence).  These facts all go to ConsulNet's central damages theme:
        that defendants' websites rip-off ConsulNet's websites' features, methods and scripts;
        that DIG built its business on targeting ConsulNet clients, and may now have as many as
        200 former ConsulNet clients; and that defendants' wrongful actions severely damaged
        ConsulNet's commercial goodwill (a recoverable element of a business's damages),
        including with its customers and long-time associate Craig Proctor.

[9]     Indeed, a damages expert's "opinions with respect to liability are simply beside the
        point."  Baer v. Chase, 392 F.3d 609, 630 (3d Cir. 2004).

Defendants admit that "an assumption of liability on the part of a damages expert is standard[.]"  Defendants' Brief at 23.  They further admit that Hoeberlein is a damages expert. Id. at 7.  While Hoeberlein assumed some measure of causation as part of the liability assumption, he focused on the data in each particular area of his damages calculations to generate the numbers found in his expert report.  See Exhibit E (excerpts from the transcript of the December 15, 2006 Deposition of Wayne A. Hoeberlein), at 10-12.

Indeed, Hoeberlein did not need to evaluate causation because this entire case is about a two-vendor market for real estate websites, i.e., those that employ the Craig Proctor/ConsulNet direct-response marketing system.  John Hokkanen's expert report goes right to this point. ConsulNet's circumstantial proof of damages thus suffices and Hoeberlein properly may "assume causation" in his expert analysis.  Cf. Continental Data Systems, Inc., 638 F. Supp. at 443 (denying defendant's motion for summary judgment where plaintiff's evidence on causation was limited to a decline in sales and possible loss of one customer, via an uncompleted sale from defendant); EFCO Corp. v. Symons Corp., 219 F.3d 734, 741-42 (8th Cir. 2000) (affirming jury verdict for plaintiff where, in a two-supplier market, causation evidence consisted of plaintiff's revenue erosion coinciding with increased revenues for defendant).

Similarly, DIG's argument that the remaining three elements of Hoeberlein's damages calculations also are "too speculative" because he "did nothing to consider any alternative potential reasons for the calculated damages" lacks merit.[10]  Hoeberlein was entitled to rely upon

---

[10]    Defendants' single sentence reference to the decision in Parkway Garage, Inc. v. City of Philadelphia, 1994 WL 412430 (E.D. Pa. Aug. 3, 1994), see Defendants' Brief at 25, provides no support for their criticism of Hoeberlein's calculations.  There, the Court considered, inter alia, the defendants' motion for remittitur on the jury's award of lost profits damages to the plaintiff parking garage.  Id. at *7-10.  The court found the plaintiff's expert's damages calculations improper under Daubert because they "were not based upon any evidence in the record which would explain the cause of Parkway's

the Hokkanen and Deale expert reports, as well as the testimony of ConsulNet's principals and

others, for the view that ConsulNet and DIG are the only two vendors offering the unique

Internet product at issue here.  See Ninth Ave. Remedial Group v. Allis-Chalmers Corp., 141 F.

Supp. 2d 957, 959 (N.D. Ind. 2001) ("[i]t is well-settled that under appropriate circumstances an

expert witness may rely on information received or developed by another person"); Fed. R. Evid.

703.  Further, "assumptions" are necessarily part of any damages estimate, and should not

mandate the exclusion of one's expert report under Daubert unless such assumptions have *no*

*possible basis* in the record.  See, e.g., ID Security Systems Canada, Inc. v. Checkpoint Systems,

Inc., 249 F. Supp. 2d 622, 689-94 (E.D. Pa. 2003) (denying defendant's motion to vacate jury

award on, inter alia, Daubert grounds) ("although it is true that some facts in the record, if

credited by the jury, tend to call the accuracy of Dr. Kursh's [lost profit] projections into

question, it cannot be said that the projections lack a proper foundation"); Aventis Envtl. Science

USA L.P. v. Scotts Co., 383 F. Supp. 2d 488, 513-15 (S.D.N.Y. 2005) (denying Daubert motion

to preclude testimony of plaintiff's damages expert) ("Defendants are free to challenge the basis

and source for Dr. Martin's numbers, but a challenge to the facts or data relied upon by Dr.

Martin does not go to the admissibility of his testimony, but only to [its] weight . . . Defendants

may cross-examine Dr. Martin at trial regarding his assumptions and the information that was

reported to him. . . .").

        In the end, it is apparent that defendants challenge Hoeberlein's report only because of

the significant damages amounts he reached, rather than the assumptions or methodologies he

employed.  "Approaches to calculating damages that are arguably aggressive" or that "are

---

        future damages, if any."  Id. at *8.  In contrast, of course, Hoeberlein's calculations are
        based on ConsulNet's evidence (referenced repeatedly herein) that the parties are

arguably open to attack on cross-examination" should not be excluded on these grounds alone, even where such approaches "are certainly highly favorable to [one's] respective client[.]"  Alco Indus., Inc. v. Wachovia Corp., 2007 U.S. Dist. LEXIS 82204, at *26 (E.D. Pa. Nov. 5, 2007) (Pollak, J.).  As Daubert mandates, rigorous cross-examination and the presentation of opposing expert testimony are the proper methods of attacking what one may view as "shaky" or "inflated" testimony, whether from a damages expert or not.  See also Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002) ("a party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination").  Defendants therefore should press their grievances with Mr. Hoeberlein's expert testimony at trial via traditional adversarial methods, rather than by their Daubert motion.

**IV.**   **Conclusion**

Based on all of the foregoing reasons, ConsulNet respectfully requests that the Court deny the entirety of defendants' motion *in limine*.

Respectfully submitted,

/s/ David E. Landau
David E. Landau
Matthew R. Varzally
Wolf, Block, Schorr and Solis-Cohen LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA  19103
(215) 977-2000

Attorneys for Plaintiff, ConsulNet
Computing, Inc.

Dated:  January 7, 2008

---

competitors in a *two-supplier market* for those seeking to deploy the Craig
Proctor/ConsulNet online direct-response marketing system for real estate agents.

<u>**CERTIFICATE OF SERVICE**</u>

I, David E. Landau, hereby certify that on the date noted below I caused a true and correct copy of the foregoing **Plaintiff, ConsulNet Computing, Inc.'s Memorandum of Law in Opposition to Defendants' Motion *in Limine* to Exclude Portions of the Testimony of Experts John B. Hokkanen and Wayne A. Hoeberlein** to be made available for viewing and downloading from the Court's ECF system by, <u>inter</u> <u>alia</u>:

> Kevin W. Goldstein, Esquire
> Stradley Ronon Stevens & Young, LLP
> Great Valley Corporate Center
> 30 Valley Stream Parkway
> Malvern, PA 19355
>
> Counsel for Defendants
> Dynamic Investment Group, Inc. and Megel David Moore

> /s/ David E. Landau
> David E. Landau

Dated:  January 7, 2008