# EXHIBIT A

*file*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSULNET COMPUTING, INC.,  :
d/b/a SUCCESSWEBSITE,        :
                            :
        Plaintiff,          :       CIVIL ACTION NO. 04-CV-3485
                            :
    v.                      :
                            :
MEGEL DAVID MOORE, et al.   :       JURY TRIAL DEMANDED
                            :
        Defendants.         :


## EXPERT REPORT OF JOHN B. HOKKANEN
## PREPARED FOR CONSULNET COMPUTING, INC.


**THIS ENTIRE REPORT IS DESIGNATED
"HIGHLY CONFIDENTIAL –
ATTORNEY'S EYES ONLY"**

Contents

1.0 Introduction, Qualifications and Summary
1.1 Qualifications
1.2 Prior Expert Testimony
1.3 Compensation
1.4 Report Scope
1.5 Summary of Report and Conclusions

2.0 Industry Background
2.1 On-line Real Estate Services
2.2 A Survey of Real Estate Sites
2.3 Additional Observations

3.0 Summary and Conclusions

Attachments
      A.  Real Estate Web Site Survey Methodology and Data
      B.  Printouts of Restricted Report Pages
      C.  Resume
      D.  List of Articles

**Expert Report**
**Prepared by John B. Hokkanen, J.D.**

## 1.0 Introduction and Summary

This introductory section summarizes my background and qualifications related to on-line services generally and on-line real estate services in particular. It also summarizes the issues addressed and report findings.

### 1.1  Qualifications

My name is John Hokkanen. I am a licensed real estate broker in the State of California and am a principal in the Hokkanen Real Estate Team in Encinitas, California. My team specializes in the sale of residential real estate, and acquires and services its clients through the use of an array of technologies, including the Internet. Some pertinent experience is discussed briefly below:

- From October 2002 to the present, I have designed, developed, and implemented real estate web sites, technologies, and marketing for our team. For our web sites[1], I am responsible for their design, programming, and, except for syndicated content, nearly every page of content.
- From April 2002 to October 2002, long before I was aware of this lawsuit, I conducted a survey of real estate web sites to identify ways that I could differentiate my wife's real estate practice from other agents via her web site. Since October 2002, I have maintained an ongoing review of sites, features, and legal issues relevant to on-line real estate services.
- In 2003, 2004, and 2005, I taught adult education classes like "Finding and Funding Your Home with the Internet" to local residents; the classes featured various real estate web sites and discussed their benefits and limitations.
- From 1995 to 2002, I worked as a technologist focused on using the Internet in professional services. In that work I led technology and practice support teams that implemented web-based systems to enhance professional services.
- From 1995 to 1999 I developed a personal web site, The Law Practice Technology Center, to discuss how Internet systems could be used to change professional practice. Fortune Magazine[2] listed my site among 27 sites (built by companies like Boeing, the Gartner Group, and the New York Times) as being an important site.
- From 1999-2000, I worked as the VP of Technology for a dot com company whose business plan focused on the sale of template-based web sites to credit unions nationwide; I was tasked with overseeing the design and development of the web site system, including content and tools syndication from various vendors.
- From 1995 to 1999, I ran a web site development and hosting company (BusinessHost, Inc.) in Atlanta, Georgia that serviced corporate clients.
- From 1978 to 1987, I worked as a weapon systems programmer.[3] I began using the Internet in 1978 (called the ARPANet at that time) to communicate with other ARPANet systems using telnet and ftp protocols.

---

[1] The web sites may be found at SurfTheTurf.com.
[2] Summer of 1998.
[3] Martin Marietta Aerospace, Westinghouse, and Parks-Jaggers Aerospace.

## 1.2 Prior Expert Testimony

I have not previously testified or rendered an opinion as an expert witness in any other litigation.

## 1.3 Compensation

I do not have a standard fee for work as an expert witness because this is the first occasion for such work. For this work, I am billing my time on an hourly basis at the following rates:

$325 per hour for non-testimony work; and
$425 per hour for deposition and trial testimony.

## 1.4 Report Scope and Summary

I have been asked by counsel for ConsulNet Computing, Inc. ("ConsulNet") to examine Craig Proctor's marketing system and ConsulNet's web implementation of it, to analyze its niche in the marketplace, to compare the ConsulNet system to the system implemented by the Dynamic Investment Group ("DIG"), and, looking at the marketplace, to render an opinion on whether or not DIG copied the Proctor/ConsulNet system and, if so, whether DIG continues to use that system.

## 1.5 Summary of Conclusions and Opinions

- Craig Proctor developed a direct response marketing system for real estate agents that is unique, innovative, and successful. That system was implemented by ConsulNet as the web implementation of Craig Proctor's marketing system.
- The Proctor/ConsulNet system has a variety of components ranging from a mortgage calculator available to everyone to restricted reports and home valuation that require consumer response.
- A study of real estate web sites from other vendors, ConsulNet, and DIG reveals the direct response marketing innovation that Craig Proctor brought to the world of on-line real estate services.
- The study shows how two of the studied attributes, restricted template content (CRT) and restricted customized content (CRC) are implemented by other vendors and how the Proctor/ConsulNet system implements them in a very different and observable manner. The study also shows how DIG has implemented these attributes using the Proctor/ConsulNet approach.
- Review of the words, concepts and style used by ConsulNet and DIG sites shows that DIG uses the same words, concepts and style of the Proctor/ConsulNet marketing campaigns. Words were changed and phrases have been rearranged, but the concepts and approach have remained the same.
- Review of the implementation of restricted reports by other vendors shows that other vendors fail to articulate specific Unique Selling Propositions ("USPs") for their restricted reports, and the interior pages developed by the other vendors did not use targeted presentations to further interest and/or qualify the consumer to respond to the report request form. In contrast, the Craig Proctor system developed numerous distinct campaigns to drive traffic from the front page to distinct, separate interior pages to further interest and qualify consumers to respond. The DIG system implemented the Proctor/ConsulNet system on both the top and interior pages.

- Review of the implementation of restricted customized response pages (CRC) shows that DIG uses the same words and concepts as the Proctor/ConsulNet system.
- David Moore's lack of substantive knowledge of real estate practice and direct response marketing in the real estate field makes it inconceivable that he designed and implemented the DIG system without copying the system and approaches developed by Craig Proctor and ConsulNet.
- By comparing the sites developed by ConsulNet and DIG, I conclude that DIG copied the direct response marketing system developed by Proctor/ConsulNet and that they are still using the Proctor/ConsulNet system.

## 2.0 Industry Background

Real estate agents obtain clients through a variety of different methods. Some of the traditional methods have included the following approaches:[4]

- Repeated contact to a selected group of strangers (also known as "farming"). This would include marketing of an impersonal nature (e.g., brochure of recent sales) as well as personal contact (e.g., door knocking).
- Marketing of properties (e.g., listing-related marketing).
- Personal branding advertising (e.g., shopping carts, billboards, etc.).
- Telemarketing to targeted audiences (e.g., expired listings, fsbos) and non-targeted audiences (e.g., every person on a particular street).
- Personal friends/family referral networks.
- Past client referral networks.
- Business-to-business referral networks (e.g., non-competing networking groups, referral relationships with non-competing agents, builder relationships, etc.).

Craig Proctor is widely known in the real estate industry for his work in adding direct response marketing to the above list of marketing systems. Anyone focused on real estate marketing will quickly become aware of his work and ideas.[5] His personal sales accomplishments as a top sales agent in the RE/Max network speak to the success of his methodologies and capabilities as a salesperson.

The Craig Proctor direct response marketing system is focused on the distinct marketing campaigns which offer a unique selling proposition ("USP"). The marketing campaigns are written to present an offer and to articulate clearly to the consumer the value of responding to that offer. By focusing on only those who respond, the system differs from telemarketing, door knocking, and other indiscriminate systems by having the consumer qualify him/herself up front as someone having a particular need instead of having the real estate agent conduct the qualification process. The system also places the real estate agent in the position of the expert and as the provider of the information or knowledge of interest. In contrast to the cold call of the telemarketer, the follow-up to a direct response by a consumer to Craig Proctor system marketing can be targeted to the consumer's specific need and the contact is a secondary contact instead of being the initial consumer contact. It is also important to note that the

---

[4] This is intended to be an illustrative, but not exhaustive, list.

[5] I became aware of his web strategy within months of surveying different approaches, long before I became aware of this matter. Over the years, I have known colleagues who have gone to Proctor seminars and used his web site system.

marketing of the agent occurs in the context of providing consumer-oriented information of value instead of a just a pure marketing pitch (e.g., "I can help you sell your home.").

Testimony by Craig Proctor reveals how his marketing system was developed prior to and independent of the Internet as a medium for his system and how he worked with ConsulNet to develop the on-line version of his system. Before analyzing where Proctor's direct response system fits into the world of on-line real estate services, it is first useful to lay out the topography of on-line real estate services as set forth in the figure below.



As shown by this figure, on-line real estate services can be thought of as a two-by-two grid, with four distinct areas. The two columns separate on-line real estate services into materials in the left column developed by second party solution providers for multiple agents from customized materials in the right column that are developed by a *specific* agent or brokerage for his/their exclusive use. The two rows separate on-line real estate services by whether or not the tools/materials are available to anyone browsing the web site on the bottom row from restricted material in the upper, pink-shaded row.

In general, the materials which offer the least distinguishing value to a real estate agent are the materials in the lower left corner. They are less valuable in developing a client relationship with a consumer because a consumer can obtain identical offerings that are freely available

from multiple sources.[6]  In general, the materials in the upper right cell potentially offer the highest client development value because they are not available to everyone visiting the agent's site and because they are customized by that particular agent.[7]

Craig Proctor's marketing system is one that has many components, but certainly some of the most significant ones are those services that reside within the restricted (pink) section of the diagram that require a response from the consumer.  The web pages present a unique selling proposition or offer to the consumer, but the contents are restricted and available only to those who respond to the offer.  Upon responding to the offer, the response is captured, and the materials can be sent to the consumer by explicit action or through automation.

## 2.1 A Survey of Real Estate Sites

I was asked to conduct a study to empirically assess the position and uniqueness of Craig Proctor's direct response system in the marketplace and to compare it to the web system implemented by DIG.  The scope, methodology, and data of the study are presented in Attachment A.  To briefly summarize it, the study was comprised of three sets of samples of sites currently available on the Internet: 1) samples from 12 vendors of real estate sites; 2) samples from 6 Consulnet sites; and 3) samples from 6 Dynamic Investment Group sites.  The top pages of the sampled sites were analyzed using a 2x2 grid above (template/custom and available/restricted) and by separating links for written material from links for tool-generated material.  Because top pages can vary dramatically with the quantity of links, the study used the percentage of links of a particular type rather than link counts (e.g., if 1 out of 15 links was a particular type, that would result in a 6.67% value rather than a value of 1).

Craig Proctor's direct response marketing system relies heavily on the use of restricted content in both templated form (e.g., on-line reports/articles) and customized form (e.g., email responses to requests for finding out the value of a home).  The study refers to these two kinds of content as Content – Restricted Template (CRT) for the on-line reports and Content – Restricted Custom (CRC) for the email response requests.  The study sought to compare how these two areas varied across the samples.[8]

To obtain a baseline for real estate sites, I began with analyzing 23 web sites from 12 vendors, excluding the ConsulNet and DIG web sites.  Using that sample, the graph below shows how the world of real estate sites utilizes restricted reports and other restricted template content (CRT).[9]

---

[6] This should not be read to mean that the materials/information have no value to the consumer.  For example, MLS search has high consumer value.  However, because it is widely available on vast numbers of web sites that do not require any registration, its potential for being the base driver for development of the client relationship is limited.

[7] Though these materials *may* have the most significant value to the consumer, this is not guaranteed.  For example, if a consumer asks the question "What is my home worth?" and the agent provides a cogent explanation based on prior sales, experience with the neighborhood, and even possible knowledge of the home, that response has extremely high value.  However, if the agent does a poor job of providing a meaningful customized response, the agent's response will be correctly perceived as having little value.

[8] Data for the other parts of the 2x2 grids was collected, but its detailed analysis is not part of this report.

[9] The graph is a normal distribution using the average and standard deviation computed from the data.  The standard deviation is quite small, which is why the distribution is tall.  The left portion of the distribution is not colored because it is not possible to have less than zero links on a page.



This graph shows that in the world of real estate sites, restricted templated content like the Proctor reports comprises a very small portion of these sites. Of the 23 sites, all but two of the sites had zero or one links, with two sites having two links to such materials. Based on the sample studied, it can be said that other real estate web site vendors do not make significant use of restricted reports. This recent sampling of current sites confirms my recollection of the same fact from my survey of real estate vendor sites in 2002.

By adding in the ConsultNet sample, the difference in approaches between all the other vendors and Craig Proctor's system is apparent.



Just looking at the two distributions tells one that the ConsulNet sites are doing something very different than the rest of the vendors. Standard mathematical test confirms the visual

conclusion that the two distributions are 99.99% distinct.[10]  While other vendors give no
significant role in their web site strategies to restricted reports, the Craig Proctor system makes
it a fundamental part of the web site.  These samples confirm my recollection from several
years ago about one of the key items that made Craig Proctor's system different.  For the
author, this is one the central innovations that Craig Proctor and ConsulNet brought to the
world of on-line real estate services.



Once you add the DIG distribution to the graph, one can quickly see that the DIG sites also
diverge dramatically from the rest of the real estate sites.  The DIG sites average an even
greater number of links to restricted reports than even the ConsulNet sites.[11]  To summarize, of
all the vendors reviewed, only ConsulNet and DIG sites use restricted reports in the manner
developed by the Craig Proctor marketing system.  The DIG distribution being to the right of
the ConsulNet distribution shows that the main difference between DIG and ConsulNet
distributions is that DIG amplified the use of the Proctor/ConsulNet restricted report pages.

The study also analyzed how real estate sites use restricted customized content (CRC) such as
requests for getting recent sales comparables or a request for new listings.  The three
distributions for the CRC content are graphed as follows:

---

[10] Stardard T test comparison.
[11] The DIG distribution is somewhat squashed because the DIG sample had greater variability, i.e., a greater
standard deviation.  Because the area under the curve always totals one, the peak of the distribution is reduced as
the variability in the distribution increases.



These three distributions have much more overlap than the CRT distributions. To some extent, the overlap is explained by the variety of web pages that qualify as CRC. For example, a site with a bare "Contact Me" form page and no USP would nevertheless be categorized as a CRC because the content received by the consumer would be customized restricted content.[12] Other sites might have CRC forms that provide a USP to draw people to the feedback form.[13] However, even with the overlap of the graphs, one can easily see how Proctor/ConsulNet changed how this approach was used on real estate web sites. The Proctor/ConsulNet system amplified the use of CRC forms, which is why the ConsulNet distribution is to the right of the other vendor distribution. DIG implemented their CRC forms in the same way, and that is why the DIG distribution is nearly identical to the ConsulNet distribution.

## 2.2 Top Page and Interior Page Comparisons

The comparison of the three samples also considered the implementation of various features across the three samples. The first of these features was an examination of words, phrases and concepts for the CRT marketing campaigns on the ConsulNet and DIG sites.[14] Here are some examples:

| ConsulNet | DIG |
|---|---|
| Danger! Buyer Traps | Buyer Pitfalls Beware! |
| Buy with ZERO Down | Purchase w/ $0 Down! |
| Sell for More | Sell for Top Dollar |
| Avoid These Mistakes | Common Seller Mistakes |
| The 9 Step System... | Seller's First Step |
| This Month's Newsletter | Consumer Newsletter |
| Featured Listings | View New Listings |
| 27 Seller Tips | Seller Secrets |

---

[12] For example, see the contact form at forsdhomes.com.
[13] For example, see the entry form for the Bubba the dog drawing at christie4re.com site.
[14] As discussed later, there was little variation among the choice of words for CRT pages on the sites by other vendors.

| Save Thousands | Prevent Overpaying |
|---|---|
| Getting the Most Money for Your Home – Secrets Revealed! | Sell Your Home – Secrets and Tips to Help Get Top $$$ |
| 10 Questions you must ask when Interviewing An Agent | Choosing the Best Realtor |
| Our Team | Meet the Team |
| What Clients Say | Client Testimonials |
| Mortgage Calculator | Real Estate Calculators |

For example, the first on the list "Danger! Buyer Traps" becomes "Buyer Pitfalls Beware!" by substituting the synonym pitfalls for traps and by rearranging the words. Had the words not been rearranged, "Danger! Buyer Traps" would have become "Beware! Buyer Pitfalls." Based on my experience, the conceptual messaging is identical whether or not the words are rearranged. A second example, "Getting the Most for Your Home – Secrets Revealed" becomes "Sell Your Home – Secrets and Tips to Get Top $$$." The concept of the campaign is identical, i.e., that learning the secrets in the article will help you sell your home for the most that you can get.

This concept matching can also be applied to the custom content forms (CRC); among those links, there were numerous one-for-one match ups between the ConsulNet and DIG systems:

| ConsulNet | DIG |
|---|---|
| Ask an Expert | Ask the Expert |
| Free Quick Over the Net Home Evaluations | FREE Analysis – Find Out the Value of Your Home |
| Foreclosures | Foreclosure Deals |
| Hot New Listings/Become a VIP Buyer | Buyer's Preferred Service |
| Become a VIP Seller/Automated Home Feedback System | Seller's Preferred Service |
| Prices in Your Area (Title: Find Out What the Home Down the Street Sold For) | Local Prices/Seller's First Step (Title: Want to Know What Your Neighbor's House Sold For?) |
| FREE Pre-Approval | Mortgage Form |
| MLS Search (This was on multiple ConsulNet sites, though it isn't clear whether it is a standard feature.) | MLS Property Search (This was on multiple DIG sites, though it isn't clear whether it is a standard feature.) |
| Guaranteed Offer | No equivalent |
| Discover Insider Access | No equivalent |
| Refer a Friend | No equivalent |
| No equivalent[15] | Quick Mortgage Form |
| There is a "Contact Us" page, but it is not equivalent because it provides contact information but not a feedback form. | Contact Me |

All but two of the CRC offers on the DIG sites have close equivalents originally developed by Craig Proctor. Though the ConsulNet sites differ from the rest of the real estate vendors, this table shows DIG has used identical concepts as on ConsulNet pages.

As already stated, the percentage of CRT restricted reports links used by other vendors is much less than that used by ConsulNet or DIG. Of the 11 other vendors, five had no restricted

---

[15] One could say that the Quick Mortgage Form is simply a derivative of the Mortgage Form which does have a counterpart. However, because of its abbreviation, I am labeling it as not having a direct equivalent.

reports, and thus it was useful to examine at a more substantive level how the other six implemented restricted reports and to compare that implementation to the system developed by Proctor/ConsulNet.  Attachment B has printouts of sample pages, and the table below summarizes the findings:

| Vendor/Site/Link/Comments | Interior Page |
|---|---|
| Vendor: Advanced Access<br>Sample Site: RichardRealtyGroup.com<br><br>Link Text: Free Reports<br><br>Comments: The front page does not offer any specific USP/explanation to entice a user to visit the interior page. | The interior page offers only a generic proposition ("The following reports will not only SAVE you money, but can make you money in real estate!") and with the titles of the reports. |
| Vendor: Point2<br>Sample Site: EricNauss.com<br><br>Link Text: Download Free Info!<br><br>Comments: The front page does not offer any specific USP/explanation to entice a user to visit the interior page. | The interior page offers a generic admonition ("It is essential that the buyer or seller be aware of all aspects of the real estate market before making a major decision.") and the titles of the reports. |
| Vendor: Homes.com<br>Sample Site: CoastalHomeFinder.com<br><br>Link Text: Reports, free reports<br><br>Comments: The front page does not offer any specific USP/explanation to entice a user to visit the interior page. | The interior page offers a generic instruction ("Please indicate below which Free Reports you would like to receive...") and the titles of the reports. |
| Vendor: Ala Mode<br>Sample Site: SamanthaFeldman.com<br><br>Link Text: FREE REAL ESTATE INFO<br><br>Comments: The front page does not offer any specific USP/explanation to entice a user to visit the interior page. | The interior page offers the title of the reports along with a generic admonition/instruction: Buying and selling real estate can be a daunting task, with so much information to be aware of. This page is designed to help educate you. Simply select the topics you'd like more information about and I'll send them to you...as always, no strings, no gimmicks from me. Just the straight-forward information you request. |
| Vendor: Z57<br>Sample Site: SouthOCProperties.net<br><br>Link Text: Real Estate Tips<br><br>Comments: The front page does not offer any specific USP/explanation to entice a user to visit the interior page. | The interior page offers a generic instruction ("Check the box on any of the following subjects below and the information will be sent to you.") and the titles of the reports. |
| Vendor: 1ParkPlace<br>Sample Site: SellSanDiego.com<br><br>Link Text: FREE REPORTS | The interior page offers no explanation of the offering other than the title of the reports. |

| | |
|---|---|
| Comments: The front page does not offer any specific USP/explanation to entice a user to visit the interior page. | |
| Vendor: Consulnet<br>Sample Site: GarnerBennett.com<br><br>Link Text: Multiple titles, multiple buttons, and multiple text description links (not visible on sample screen shot).<br><br>Comments: The front page seeks to present multiple campaigns with different USPs to entice a user to visit the specific interior page that is relevant to that user. | The interior page for each specific campaign seeks to provide greater detail on exactly the reasons why a user would want the particular report and the type of information that is contained within it. (See highlighted orange box on the sample page.) |
| Vendor: Dynamic Investment Group<br>Sample Site: RichardWall.com<br><br>Link Text: Multiple titles and multiple buttons with descriptions.<br><br>Comments: The front page seeks to present multiple campaigns with different USPs to entice a user to visit the specific interior page that is relevant to that user. | The interior page for each specific campaign seeks to provide greater detail on exactly the reasons why a user would want the particular report and the type of information that is contained within it. (See highlighted orange box on the sample page.) |

Of the other vendors that had a restricted report page, all but two used a sole link from the front page to the interior reports page; the other two sites used two links, both of which were identical or similar.[16]  The top page's USP of all of these sites was conceptually the same: Download Free Info.  The interior page for all of them was comprised of the following: 1) some general introduction/instruction; 2) a list of reports with checkboxes; and 3) a form for submitting contact information.  None of the sites attempted to explain the specific value of any particular report or to provide any USP that might further interest or qualify the consumer with respect to a particular report.

In contrast, the ConsulNet sites have multiple links to distinct interior pages.  The top page campaign links vary from abbreviated titles like "Buy With ZERO Down" to longer titles elsewhere on the page like "Buy a Home With No Money Down" or "$0 Down  Buy with as little as NO MONEY DOWN!"  The campaigns on the front page link to distinct interior pages instead of having a single interior report page as was implemented with the other vendors.  These separate interior pages have a more detailed description that follows up on the USP campaign.  For example, the no downpayment page identified earlier has the following interior description:

### HOW TO BUY A HOME WITH ABSOLUTELY NO MONEY DOWN

---

[16] Marksmiddy.com has two references to "Free Reports" and CoastalHomeFinder.com has references to "Reports" and "free reports."

A new home ownership program allows qualified buyers to buy a home with **absolutely no downpayment.**

You may have owned a home before and are presently renting or maybe you are a first time homebuyer and need a way to break into the housing market but held back because you thought you required a $10,000, $20,000 or even more for a downpayment. Well regardless of your present situation, if you want to get into, or re-enter the housing market without having to make a cash downpayment, then **this new program may be just what you're looking for.**

Why pay your landlord's mortgage when you can be building your own equity.

Industry insiders have prepared a new special report entitled, ***"How to Buy a Home With Zero Down"***, and reveals how this new and innovative program can get you into the housing market immediately and with absolutely no downpayment. Order this report *NOW* and you can get into the housing market *NOW* and with *ABSOLUTELY NO DOWNPAYMENT.*

As one can see from the page printouts, the end user experience for the ConsulNet sites is quite different from the end user experience of the other vendors. The ConsulNet site markets the USP of the report on the front page, and then interests and qualifies the user through a more detailed description of the USP on the interior page. If the consumer does not find the information interesting and relevant to his/her situation, he/she need not follow through with completing the request form. By completing the form, the consumer prequalifies him/herself as someone with this particular need/interest.

The DIG sites use the same approach developed by Craig Proctor and ConsulNet. Multiple marketing campaigns of differing USPs (and differing amounts of detail) are presented on the front page to draw users to the separate and distinct interior pages. Once on those interior pages, the USP is restated with more detail to qualify the consumer and to interest him/her into submitting the feedback form on the page.

## 2.3 DIG's Use of the Proctor/ConsulNet System

Craig Proctor developed these approaches after years of work in direct response marketing for real estate off-line. The differences identified above between Craig Proctor's system and other web site vendors arises from the fact that he took the direct response marketing system that he developed off-line and migrated it to the Internet with the help of ConsulNet.

David Moore acknowledges that at the time that DIG implemented their system, he was not a real estate agent, had no significant practice knowledge of real estate, and had never before implemented a real estate web site. The systems that he implemented were completely divergent from what other vendors had implemented at that time, and what other vendors have in place today. In comparing the DIG sites to the ConsulNet sites, the DIG sites diverge from the mainstream in the same ways ConsulNet changed how on-line real estate services were presented to consumers.

Over nearly two decades I have had the opportunity to innovate with technology, to implement change within professional services, to innovate new ideas in on-line professional services, to see real estate web sites evolve since 2002, and to work with dozens of agents of varying professional, marketing, and technological proficiencies. From those years of experience, it is

my opinion that it is difficult to implement even small innovations to a professional's on-line strategy even when the people doing it are highly skilled, incredibly smart, and dedicated. It is inconceivable that someone without any significant real estate practice knowledge or real estate marketing experience could enter the real estate field and within a few months develop a web site system that diverges so dramatically from the norm.

It is important to note that: 1) Craig Proctor's innovation is not a trivial one; and 2) not only does the DIG system diverge from mainstream real estate sites, it diverges in exactly the same ways that the Proctor/ConsulNet system diverges. The changes that Proctor/ConsulNet made in implementing their web site system are not some trivial innovation like the adding of a slide show of new listings to the front page. Their innovation was to systematically apply Proctor's direct response marketing experience to the development of a real estate web site system from the ground up. While there are instances of two equally skilled practitioners developing the same innovation independently, it is completely implausible that Moore, who was completely unskilled in the relevant practice, could come up with a parallel innovation at all, much less within a few months.

Mr. Moore was not a skilled real estate practitioner and did not have years of experience implementing direct response marketing in the field of real estate. He makes no claim that he drew upon any other vendor or entity's work in developing his system. Even if he had done a survey of real estate sites as I have done over the years, he would have found a mountain of web sites that delivered content in the same manner as the web sites from the other vendors that I sampled for this study. The fact that DIG's web sites may have changed over the last few years does not alter the results of the empirical studies or change the duplication of words, concepts, and methods from the Proctor/ConsulNet system into the DIG system. The overlap between the DIG system and the ConsulNet system can only be the result of deliberate and intentional copying and continued use of the direct response marketing system developed by Craig Proctor and ConsulNet.


John B. Hokkanen                           8/11/2006
ComHome.com, Inc.                            Date
535 Gardendale Rd
Encinitas, CA 92024
Ph: (760) 634-0300
www.SurfTheTurf.com

ATTACHMENTS

**A**

**Attachment A**
**Study Methodology and Data**

In addition to sites implemented by the parties to the litigation, the following other vendors were reviewed: Advanced Access, Number 1 Expert, Z57, Ala Mode (X Site), Agent Image, Superlative, Realty Tech, Homes.com, Point2, iHouse, 1Park Place, and RIM-SD. Of those, two samples were selected from each, though only one was chosen for RIM-SD.[17]

In the on-line real estate services diagram, tools (e.g., MLS search) and content (e.g., "About Me") are placed together. To analyze the makeup of a real estate web site, content is separated from tools. This results in obtaining two 2x2 analysis grids. One grid addresses content, and the other grid addresses tools. Figure B shows the form of the worksheet used for this analysis:

CONTENT

| | TEMPLATE | CUSTOM |
|---|---|---|
| RESTRICTED | CRT | CRC |
| | % | % |
| OPEN | COT | COC |
| | % | % |

TOOLS

| | TEMPLATE | CUSTOM |
|---|---|---|
| RESTRICTED | TRT | TRC |
| | % | % |
| OPEN | TOT | TOC |
| | % | % |

© J. Hollaman, 2006
All Rights Reserved

This worksheet tool allows one to categorize and organize the links both by their origin as well as accessibility. The acronyms in the cells represent a mnemonic for marking up a web page.

Cataloging some links can be fairly straightforward while other links may fall into gray areas requiring judgment based on the intent of the developer and the expectation of the consumer,

---

[17] The RIM-SD site appeared to have mostly custom content, and, therefore, it was not obvious whether this vendor was a supplier of a templated real estate site or more of a developer of real estate sites using templates that that they have developed in the past.

and it would be inaccurate to categorize content pages as tools pages merely because the content is stored in a database as opposed to a static html page.

By employing this grid of eight cells, one can create a common reference point for discussing the orientation of a web site as well as for comparing the site to other sites. To some extent, the grid of numbers represent the model upon which that web site was constructed, and the three dimensions (template/custom, restricted/open, content/tools) provide a consistent methodology for reviewing a site.

To analyze a site, the front page is analyzed[18], labeling each link with the most appropriate acronym. Splash pages are, if found, ignored. Dead links, links to external sites, or links to other programs (e.g., mail links) are ignored. Please note that links to external pages might not be ignored in all circumstances; if judgment suggests that the originating source of the link is monitored so that usage can be captured, those links would most likely be included. Links provided on a page that are purely intended for search engines would be ignored; these can sometimes be identified by size of type face, location on the page, page breaks, etc. Links created by mouseover menus are included on the basis that content expands by merely cursoring over the page without any other action. Select boxes that have a long list of links may or may not be included depending upon location, type face, etc. that suggests the importance placed upon them.

Finally, it should be noted that it can be difficult to know for certain whether a form request for certain kinds of information will actually yield an automated template response or a customized response from the real estate agent. Unless it is known that the request would be fulfilled through an automated tool (e.g., an email fulfillment response), it should be assumed that the request is a request for a hand-crafted customized response. For example, though a request for recent listings meeting some criteria might potentially be done through automation, it is more often the case that such requests are the result of a hand-crafted search by the agent with any necessary follow-up questions simply because of the variety of locale-specific questions that might assist in narrowing the search results. Therefore such forms would typically be categorized as Content-Restricted Customized (CRC). Because of the difficulty in knowing how each agent and vendor will service such forms, it is best to avoid any bias and assume that the request is intended to be a CRC request.

### Vendor/Site Selection Methodology
Before selecting any web sites, the set of vendors was identified. To do this, a list of well-known vendors in the San Diego target market were assembled (e.g., Advanced Access, 1ParkPlace, Homes.com, iHouse, etc.). This base list was then supplemented with the remaining vendors identified by deponents in the litigation (e.g., Best Image).

From the list of vendors, Google® was used as a tool to identify the web sites to be reviewed. Searches were run with terms like "z57 carlsbad" or "number1expert Encinitas" or "iHouse southern California."[19] From the result set, the top 15 or 20 web sites were examined. If the

---

[18] Utilizing the top page links derives from the content hierarchy that the creator the site has imposed upon his/her content. The fact that the creator of the site has chosen to put specific content/links on the top page inherently reflects a valuation/importance of the content/links.

[19] Multiple searches may have been run for any particular vendor. The examples identified may or may not have been the actual Google® searches used.

real estate agent on the site was recognized as an experienced agent (e.g., Christie Kramer-Levander), then the site was selected for review.  If the result set did not yield any agent sites that were immediately identifiable, then another search might be run utilizing different search terms in an effort to locate a site by an identifiable candidate.  Two candidate sites were selected for each vendor.

For web sites relating to the litigants, a few sites were used based on the fact that the agents had been deposed (i.e., Proctor, Wall, Cox).  For the remaining sites, select phrases from teasers for articles were used as the search terms.  From the top couple of pages of links, sites were selected for geographical variety (i.e., avoid having more than two Canadian sites), and, if possible, visual variety (e.g., Capitol).  A total of six sites from each litigant were identified.

The following table shows the selection of sites sampled:

| Other Vendors | ConsulNet | DIG |
|---|---|---|
| RichardRealtyGroup.com | BrianMoses.com | WeSellAz.net |
| MarkSmiddy.com | HomeSmiths.com | RichardWall.com |
| SamanthaFeldman.com | HomeSense.com | TheKofahlTeam.com |
| SoCalSanDiegoRealty.com | SilverLakeRealEstate.com | Capitol-Realty.com |
| HummerHomes.com | GarnerBennett.com | ConleyHall.com |
| SanDiegoRealEstateHomesForSale.com | CraigProctor.com | LanceMohr.com |
| JerryGlaser.com | | |
| BobbieNelson.com | | |
| MicheleMamo.com | | |
| JimKlinge.com | | |
| CoastalHomeFinder.com | | |
| ForSDHomes.com | | |
| EricNauss.com | | |
| JasonAustell.com | | |
| FtMyersHomes4U.com | | |
| SouthOCProperties.net | | |
| IlonaandCompany.com | | |
| SellSanDiego.com | | |
| SanDiego1RealEstateSource.com | | |
| Gellens.com | | |
| Christie4RE.com | | |
| MichaelBartels.com | | |
| PAHouseHunt.com | | |

The data collected in the study can be summarized for each of the three samples in the eight collection cells.  Please note that all values are percentages (e.g., 0.01692 = 1.692%).

Other Vendors

|       | Avg     | StDev   |
|-------|---------|---------|
| CRT   | 0.01692 | 0.02622 |
| CRC   | 0.19102 | 0.08210 |
| COT   | 0.26016 | 0.16007 |
| COC   | 0.37063 | 0.17128 |
|       |         |         |
| TRT   | 0.01950 | 0.03365 |
| TRC   | 0.00000 | 0.00000 |
| TOT   | 0.13943 | 0.10545 |
| TOC   | 0.00235 | 0.00788 |

Proctor/ConsulNet

|       | Avg     | StDev   |
|-------|---------|---------|
| CRT   | 0.42477 | 0.04823 |
| CRC   | 0.27531 | 0.04732 |
| COT   | 0.09854 | 0.02623 |
| COC   | 0.15181 | 0.05725 |
|       |         |         |
| TRT   | 0.00716 | 0.01753 |
| TRC   | 0.00000 | 0.00000 |
| TOT   | 0.04242 | 0.01437 |
| TOC   | 0.00000 | 0.00000 |

DIG

|       | Avg     | StDev   |
|-------|---------|---------|
| CRT   | 0.52255 | 0.09338 |
| CRC   | 0.27589 | 0.08423 |
| COT   | 0.05805 | 0.02320 |
| COC   | 0.07694 | 0.04802 |
|       |         |         |
| TRT   | 0.03973 | 0.01681 |
| TRC   | 0.00000 | 0.00000 |
| TOT   | 0.02685 | 0.00903 |
| TOC   | 0.00000 | 0.00000 |

**B**

**Attachment B**

### Restricted Reports - Printouts

The following pages contain the front and secondary pages from sampled vendors for their implementation of restricted articles/reports.

















C

## ATTACHMENT C
## JOHN HOKKANEN, ESQ.

535 Gardendale Road
Encinitas, CA 92024          John@SurfTheTurf.com          Home:  (760) 942-4242
                                                          Work:  (760) 634-0300

### SUMMARY

Over ten years of experience in blending technology with professional services, with additional experience as a real estate agent, a lawyer and a technology developer.  Understanding of the practice of real estate and client service, and how technology can support and enhance them.  A proven track record for translating business needs into project goals, managing projects to meet deadlines, and thinking strategically.

### PROFESSIONAL EMPLOYMENT

### CASA BELLA REALTY & MORTGAGE & GEMHOME.COM, Encinitas, CA   2002 – Present
*Associate Broker (Casa Bella), President/Broker (GemHome.com, Inc.)*

- Develop web-based systems for real estate agents to interact with clients and provide services on-line.   Responsible for design and development of all aspects of the SurfTheTurf.com web sites.
- Write and proof content and syndicate third party content to provide rich user experience on web sites.
- Service real estate clients (buyers and sellers) – Hold open houses, show property, provide listing information, prepare tours and tour information, create market analytic reports, enter listing information in the MLS, email property information to clients, etc.
- Develop marketing and advertising for agents on the Hokkanen Team – Create listing brochures, open house and for sale signs, postcards, refrigerator magnets, car magnets, calendars.
- Direct, film, and produce real estate videos of home tours, area information, loan information, market updates, etc.
- Research and develop new technologies to be implemented by the Hokkanen Team.

### FIRST HORIZON HOME LOANS, Encinitas, CA                                    2003 – 2004
*Loan Officer, Encinitas Branch*

Met with clients to discuss home financing and loan programs, and took loan applications. Acquired necessary paperwork from borrowers and packaged loans for submission to underwriting. Reason for leaving: The Hokkanen Team's real estate practice was established.

### LATHAM & WATKINS, Los Angeles, CA                                           2001 – 2002
*Knowledge Manager, Global Technology Services*

- Meet with attorneys to identify opportunities for knowledge management initiatives. Survey technology vendors (e.g., portal, search engines, expert systems) and make recommendations.
- Lead the knowledge services group that was pulled together from content managers in different practice groups and offices.  Develop an internal intranet site for the group to share ideas and information relating to the group's mission.

- Define functional requirements of applications.  Work with practice groups and offices to redesign their intranet sites.

**VIVIANCE, Austin, TX**                                                                  2001
*Vice President of Production and Project Management*
- Developed corporate web-based training systems.
- Consulted with clients to identify functional requirements.  Developed project plans to define scope, resources, and timelines for projects.  Identified critical issues, resolved problems, and managed work of internal and external developers and designers.
- Reviewed existing project management procedures and implemented additional processes for maintaining quality and cost control.

**GOOD2CU.COM, Austin, TX**                                                        1999 – 2000
*Senior Vice President, Technology*
- Responsible for design and development of a web-based content management system.
- Developed technology business plan and budget.  Identified and selected critical technology partners.  Worked with senior executives of other functional areas on technology integration.
- Managed implementation of content management system. Oversaw and approved each stage of the development process, including business strategy and requirements definition, technology selection, functional design specification, and system implementation.
- Reviewed and approved work plans of external consultants.

**ALSTON & BIRD LLP, Atlanta, GA**                                              1995 – 1999
*Chief Knowledge Counsel*
Founder/Director of the Knowledge Services Department whose mission was to enhance the use of technology by the attorneys for the benefit of the firm and its clients.  Focus was on internal efficiencies, new client services, and client development.
- Programmed web applications and designed databases.  Hands-on management of the group that designed, programmed, and debugged dozens of web applications, including work product retrieval, case and matter management, knowledge workflow applications, calendaring systems, and work assignment and assessment applications.
- Assisted the firm's corporate clients and internal practice groups in understanding their technology needs and developing their technology strategy.  Cheerleader for judicious use of technology.
- Achieved record success in marketing the firm's technology offerings.  Met with clients, presented talks at national conferences, and wrote published articles. Projects were referenced in numerous magazines and newspapers including The Industry Standard, Information Week, CIO Magazine, and Knowledge Management Magazine.
- Handled administrative details of the department including recruitment and evaluation of employees, development of budgets, and selection of technologies.

**BUSINESSHOST.COM, INC., Atlanta, GA**                                      1995 – 1999
*President*
Owned and operated a small business that provided web site, intranet, and extranet development and hosting to corporate customers in general, and professional services in

particular.  Administered and managed servers, designed and wrote web server software and created databases utilized by this software.

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, Atlanta, GA          1991 – 1995
*Assistant Regional Counsel*
- Wrote legal memoranda and pleadings for Federal and Administrative Courts.  Advised government clients on legal issues relating to federal regulations as well as litigation strategy.
- Developed technology strategy and implemented systems.  Assisted senior management with translating business needs into workable systems.  Represented the office in inter-agency technology groups.  Administered network and developed practice systems.
- Received the Award for Personal Distinction from Secretary Shalala  (This is the top award bestowed by the department; only ten awards in a department of 300,000 were given annually.)

## U.S. COURT, Eastern District of Washington, Spokane, WA          1990-1991
*Law Clerk*
Reviewed pleadings, wrote bench memoranda and drafted orders for civil and criminal matters before the court.  Peformed legal research on Westlaw and Lexis.

## VARIOUS AEROSPACE COMPANIES, Orlando, FL          1978-1988
**MARTIN-MARIETTA AEROSPACE (both direct and as a contractor),**
**PARKS-JAGGERS AEROSPACE (direct), WESTINGHOUSE (as a contractor)**
*Software Engineer*
- Designed real-time weapon systems software for controlling bomb and missile hardware and computing navigational and targeting algorithms.
- Designed test-set software for validating weapons system hardware and algorithms.
- Reviewed system documentation and wrote software test and design documentation.
- Integrated and debugged systems.  Worked with hardware, test, and quality assurance engineers to integrate software in avionics or weapon systems.

## EDUCATION

Assorted on-line courses to fulfill continuing education requirements by the California Department of Real Estate
J.D., *Order of the Coif and Law Review*, University of Virginia, Charlottesville, VA 1990
B.A., Political Science, *With Highest Distinction,* Rollins College, Winter Park, FL, 1984

## PROFESSIONAL ACTIVITIES

California Association of Realtors, North San Diego County Association of Realtors
Law Technology News Editorial Board (former), Practice Innovations Editorial Board (former)

**D**

## ATTACHMENT D
## List of Articles from 1997 to Present[20]

*Enhancing Your Legal Intranet* - Law Solutions for the Legal Profession Products – March 1997
*Process Re-engineering with Handheld Computers and the Internet* - Information Resources – June 1997
*Leveraging a Firm's Archives* - Law Technology Product News21 – August 1997
*Developing Collaborative Document Knowledge Systems* - Law Journal Extra  – August 1997
*Reasons for Using Intranets to Implement Legal Practice Systems* – The Law Practice Technology Center – August 1997
*Noise Reduces Value of Document Retrieval* - New York Law Journal  – September 23, 1997
*Online is the By-Word* – Law Technology Product News – December 1997
*New Techniques Allow Instant Data Base Creation* – National Law Journal – December 15, 1997
*Online Technologies will Play Greater Role in Firms in 1998* - New York Law Journal – December 23, 1997
*Advanced Legal Intranets* – New York Law Journal – January 1998
*Supporting Your Litigation Via the Web* – Law Technology News – February 1998
*Intranets: Low-Cost Tech can Help Support Litigation* - New York Law Journal – February 17, 1998
*Search 'Widgets' Streamline Internet Research* – The National Law Journal – April 1998
*Scrap Notions of Perfect Technology Systems* – Law Technology Product News – April 1998
*Firm Web Sites:  Beyond Electronic Brochures* – Law Technology Product News – September 1998
*Extranets And Beyond* – The American Lawyer's Technology Magazine – Fall 1998
*Is Your Firm Leveraging Technology* – Law Technology Product News – October 1998
*Jettison Your Old Views on Tech Implementation* – Law Technology News – January 1999
*The Law Firm Intranet* – Internet Law Researcher – January 1999
*Legal Groupware:  It's Time Has Not Yet Come* – Law Technology News – February 1999
*Simplify Updating Your Web Site!* – The Internet Lawyer – February 1999
*Web-Based Technology Is Not Just For Insiders* – The National Law Journal – February 1999
*Just Do It! How to Launch Your Law Firm's Intranet* – Law Technology News – March 1999
*Ground Zero: Will You Survive the Internet Explosion?* - Law Practice Management – March 1999
*What's the most over-rated trend in Technology* – Law Technology News – May 1999
*Firm Should Jump to Join This "Revolution"* – Law Technology News – May 1999
*Investing in Technology: A Business Framework for Thinking about Law Office Technology* – Managing Partner – September 1999
*Giving Groupware a Home*  –  National Law Journal – October 12, 1999
*Intranet Strategies for Beyond 2000* – Law Technology News – October 1999
*Knowledge Services:  Not Just a Buzz Word* – Law Technology News – December 1999
*Taking Technology to the Next Level* – World Law Business – March 2000
*Keeping Up With Technology* – The Lawyer – April 2000
*Taking it to the Next Level: redefining Technology and Revolutionizing Services* – Law Practice Management – May 2000
*Investing in Technology, Part II (Implementing KM)* – Managing Partner Magazine – May 2000
*Knowledge Management as Internet Strategy* – Law Technology News – May 2000
*There goes Gadget Guy, What's Hot and What's Not in Tech* - The American Lawyer –  June 2000
*Surviving Exotic Islands and New Hampshire* – Law Technology Product News –  September 2000
*Extranet Spotlight: Views from the Front Lines* – Law Technology News – November 2000
*Knowledge Management Bibliography* - ABA LPM Journal – June 2000
*I'm Tired of Traveling Like a Sherpa* – Law Technology News – June 2001
*Dot Com Reflections* – Managing Partner – September 2001
*Trends in Law Firm Technology Investment* – AsianIP Magazine – February 2002
*Report from Hong Kong Legal Sys-Tech* – Managing Partner – February 2002
*Why Knowledge Management? – Justifying Investment* – ABA LPM Journal – March 2002
*Outsourcing: Escaping Storms and Bumps* – Law Technology Product News – May 2002
*Knowledge Tools for Knowledge Practitioners* – AI & Law Journal – July 2002

---

[20] Though the list is complete to the best of my knowledge, I have never had reason to maintain a comprehensive list of articles.  This list was pieced together from digital files, tear-outs from magazines, and on-line searches.
[21] Law Technology Product News changed their masthead to Law Technology News in the late 90s, though some on-line services may still reference it with the former title.

*Knowledge for Sale – Practice Innovations* – July 2002
*Electronic Billing, E-voicing is about to Go Mainstream* - Law Technology Product News – October 2002
*Are we still running scared* - Law Technology Product News – November 2002
*The Eternal Debate, Cable Modem Versus DSL* - Law Technology Product News – February 2003